FILED IN CHAMBERS
U.S.D.C. ROME

Date: Jun 02 2021

JAMES N. HATTEN, Clerk

By: s/Jill Ayers

Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ELLENA MOORE,

      Plaintiff,

      v.

COBB COUNTY SCHOOL
DISTRICT,

      Defendant.

CIVIL ACTION FILE

NO. 1:19-CV-4174-MLB-WEJ

## FINAL REPORT AND RECOMMENDATION

Plaintiff, Ellena Moore, alleges that her former employer, Cobb County School District (the "District"), interfered with her ability to take medical leave and retaliated against her for doing so in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq. (Compl. [1] Counts One & Two, ¶¶ 78-88); discriminated against her based on her disabilities and retaliated against her for engaging in protected activity in violation of the Americans with Disabilities Act ("ADA"), as amended by the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12101 et seq., and in violation of Section 504 of the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 701 et seq. (Compl. Counts

Three & Four, ¶¶ 89-108); retaliated against her for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981 (Compl. Count Five, ¶¶ 109-13); and retaliated against her for complaining about discrimination in violation of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d et seq., and 42 U.S.C. § 1981 (Compl. Count Six, ¶¶ 114-21).

This matter is before the Court on Defendant's Motion for Summary Judgment [58].   For the reasons explained below, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [58] be **DENIED IN PART** and **GRANTED IN PART**.

## I.    STATEMENT OF FACTS

In support of its Motion for Summary Judgment, defendant as movant filed a Statement of Undisputed Material Facts ("DSMF") [58-2]. See N.D. Ga. Civ. R. 56.1(B)(1).  As required by Local Civil Rule 56.1(B)(2)(a), plaintiff submitted a response to those proposed facts.  (See Pl. Resp. to DSMF [61-1] ("R-DSMF").) Further, as allowed by Local Civil Rule 56.1(B)(2)(b), plaintiff submitted her own statement of additional material facts.  (See Pl. Statement of Add'l Material Facts [61-2] ("PSAF").)   As required by Local Civil Rule 56.1(B)(3), defendant submitted a response.  (See Def. Resp. to PSAF ("R-PSAF") [66].)

2

The Court uses the parties' proposed facts and responses as follows. Where one side admits a proposed fact, the Court accepts it as undisputed for purposes of this Motion and cites only the proposed fact. Where one side denies a proposed fact, the Court reviews the record cited and determines whether a fact dispute exists. If the denial is without merit, and the record citation supports the proposed fact, then the Court deems it admitted and includes it herein. The Court sometimes modifies a proposed fact based on the record cited in the opposing party's response. Finally, the Court excludes immaterial facts,[1] includes some facts from its own review of the record, see Fed. R. Civ. P. 56(c)(3), and considers all proposed facts in light of the standards for summary judgment, set out infra Part II.

## A.    The District's System for Evaluating Teachers

The District operates more than 144 schools and employs over 13,000 people. (DSMF ¶ 1.) The District employed plaintiff (African American) as a teacher at East Cobb Middle School (the "School") for the 2015-2016, 2016-2017,[2] and 2017-2018 school years. (Id., as modified by R-DSMF ¶ 1; see also Moore Dep. of Nov.

---

[1] The Court excludes the following facts as immaterial: DSMF ¶¶ 2, 15-16, 44; PSAF ¶¶ 7-12.

[2] In addition to her teaching role, plaintiff served as the Math Department Chair for the School and the PLC lead for the math teachers in her grade level. (Young Dep. [80] 64-66 & Ex. 5 [80-6].)

3

4, 2020 [77] 28.)[3]  The District also employed Leetonia Young (African American) as the principal of East Cobb Middle School (the "School").  (Young Decl. [58-3] ¶ 2; Moore Dep. of Nov. 4, 2020 [77] 49-50.)

In an effort to ensure consistency and comparability for evaluating teachers across Georgia, the Georgia Department of Education (the "GADOE") implemented a common evaluation system for all teachers called the Teacher Keys Effectiveness System ("TKES").  (DSMF ¶ 5.)[4]  The overarching goal of TKES is to support the continuous growth and development of each teacher by monitoring, analyzing, and applying pertinent data compiled within a system of meaningful feedback.  (Id. ¶ 6.)

---

[3] The Court sustains plaintiff's objection to DSMF ¶ 4, proposing teacher functions based on a written job description, and excludes it as irrelevant.  (See DSMF ¶ 4, citing Young Decl. [58-3] ¶ 6 & Ex. 2.)  Plaintiff directly refutes the proposed fact by testifying that the proffered job description did not apply to her as a teacher in a non-leadership role.  (See R-DSMF ¶ 4, citing Moore Dep. of Nov. 4, 2020 [77] 95.)

[4] Plaintiff objects to DSMF ¶¶ 5 through 7 as immaterial, incomplete, and lacking foundation because Ms. Young is a school principal and does not state any other affiliation with the Georgia Department of Education.  (See R-DSMF ¶¶ 5-7.)  The Court overrules plaintiff's objections as argumentative.  As a school principal, Ms. Young may speak to the system she used to evaluate her teaching employees during the relevant period, which included plaintiff.

4

TKES consists of multiple components that contribute to a teacher's overall evaluation, including the Teacher Assessment on Performance Standards ("TAPS") which provide evaluators with a qualitative, rubrics-based evaluation method by which they can measure teacher performance related to quality performance standards.  (DSMF ¶ 7.)  Teachers are evaluated and rated on how well they perform in ten different performance standards:  Professional Knowledge, Instructional Planning, Instructional Strategies, Differentiated Instruction, Assessment Strategies, Assessment Uses, Positive Learning Environment, Academically Challenging Environment, Professionalism, and Communication. (Id. ¶ 8.)[5]  The GADOE mandates that evaluators conduct at least two formal observations and four walkthroughs, or frequent brief observations, of teachers with feedback provided to the evaluated teacher and with teachers responsible for

_____

[5] Plaintiff objects in part to DSMF ¶ 8 as immaterial and denies that she was evaluated accurately.  (R-DSMF ¶ 8.)  However, plaintiff admits that the proposed fact recites the ten performance standards by which teachers are evaluated.  (Id.) The Court overrules plaintiff's objections as argumentative, and holds that the proposed fact is material given that both parties discuss the 2017-2018 teaching evaluations of plaintiff in their briefs.

5

submitting documentation, including lesson plans, as requested by the evaluator. (Id. ¶ 9.)[6]

In making judgments for the end of the year Summative Assessment on each of the ten performance standards, the evaluator is directed to determine where "the totality of the evidence and most consistent practice" exists based on observations and documentation provided by the teacher for the entire evaluation period, not just a particular lesson or snapshot in time. (DSMF ¶ 10[7]; see also id. ¶ 20.[8]) The

---

[6] Plaintiff objects to the evaluation system set forth in DSMF ¶ 9 as inapplicable to her because of her status as a veteran teacher. (R-DSMF ¶ 9.) However, plaintiff's citations fail to support her assertion or refute the proposed fact's application to her. In support of her objection, plaintiff cites to the deposition testimony of Assistant Principal Marianne Mitchell, who stated that a less frequent "flex" evaluation plan typically applies to "[a]nyone with three or more years['] experience that is not new to a position and/or to the building." (Mitchell Dep. [76] 93.) Therefore, by plaintiff's own account she would not have been under the flex plan because she was employed in her position at East Cobb Middle School for less than three full years during the events at issue. (See Moore Dep. of Nov. 4, 2020 [77] 28 (testifying that she "only spent three years at East Cobb [Middle School]"); see also Young Dep. [80] 126 (plaintiff was "less than a three-year employee").) Accordingly, the Court overrules plaintiff's objection to DSMF ¶ 9.

[7] Plaintiff objects to DSMF ¶ 10 as immaterial. (R-DSMF ¶ 10.) The Court overrules her objection as argumentative.

[8] Plaintiff admits DSMF ¶ 20, which simply restates DSMF ¶ 10. DSMF ¶ 20 states: "Under the TKES evaluation system, at the end of each school year each teacher is evaluated based on their consistency in adherence to the ten performance standards based upon observation, evaluation, and teacher progress based on the

Summative Assessment takes into consideration all previous evaluations; thus, earlier ratings affect the summative rating.  (PSAF ¶ 5; <u>see also</u> Young Dep. [80] 48-53.)[9]  If a teacher earns an overall rating of a Level I or II on their end of the year Summative Assessment, the GADOE defines this rating as "not proficient" and the CCSD may not offer that teacher a contract for the following school year. (DSMF ¶ 11.)

### B.    Absences During the 2016-2017 School Year

On March 24, 2017, Ms. Mitchell (an assistant principal) issued a letter of direction to plaintiff regarding excess absenteeism for the 2016-2017 school year. (DSMF ¶ 24; Moore Dep. of Nov. 4, 2020, Ex. 2 [77-3]; Young Dep. [80] 80-81.)[10] The letter's introductory paragraph states as follows:

———————————

totality of the year."   However, plaintiff denies that Ms. Young accurately evaluated her.  (R-DSMF ¶ 20.)

[9] The Court overrules defendant's objection to PSAF ¶ 5 as argumentative. (R-PSAF ¶ 5.)  Notably, Ms. Young's deposition testimony, which defendant cites in its objection, supports plaintiff's proposed fact.  Indeed, Ms. Young explained that prior evaluations and observations served as a guide to rate a teacher for her final Summative Assessment.  (<u>See</u> Young Dep. [80] 48-53.)

[10] Plaintiff objects to DSMF ¶ 24 as immaterial.  (<u>See</u> R-DSMF ¶ 24.)  The Court overrules that objection because defendant refers to the March 24, 2017 letter in its reply and it is necessary background information to understand the parties' arguments.  (<u>See</u> Def. Reply [65] 4-5.)  However, the Court excludes the second part of that proposed fact because it is unsupported by the record evidence.

> As we discussed during the conference, you had taken a total of 9.25 days of short[-]term leave since July 25, 2016.  As of March 21, 2017 you are at or nearing the level of absenteeism that is considered unacceptable, in that it poses an undue hardship on your coworkers and the entire department.  The instruction you provide to students is critical to student achievement, and prompt and regular attendance is part of the essential functions of your job duties.

(Moore Dep. of Nov. 4, 2020, Ex. 2 [77-3].)  The letter also states that "[a]bsences in excess of six and one-half (6.5) days within a fiscal year for 180-189 day employees, seven (7) for 190-194 day employees, eight (8 for 210-239 day employees), nine (9 for 240-260 day employees) may result in corrective action consistent with progressive discipline."  (Id.)  The letter instructs plaintiff to improve her attendance in general and admonishes her that failure to improve attendance and/or any other misconduct may result in further disciplinary action up to and including termination.  (Id.)

Plaintiff does not recall receiving a copy of the letter but did have a conversation with Ms. Mitchell about her absences during the 2016-2017 school year.  (Moore Dep. of Nov. 4, 2020 [77] 82-84.)  According to plaintiff, when Ms. Mitchell asked her about the absences, she told her the reasons for most of them, and Ms. Mitchell replied, "That was fine and that was just a formality and that was the end of it."  (Id. at 84.)

8

### C.   2016-2017 Complaints Regarding Student Treatment

At the end of the 2016-2017 school year, plaintiff complained to Ms. Young about the treatment of three African-American students by specific teachers at the School, but at no time complained about discrimination against any School employees.  (DSMF ¶ 25; Moore Decl. [82-1] ¶ 3; see also Moore Dep. of Nov. 5, 2020, Ex. 16 [78-8].)  Two of the incidents involved three Caucasian teachers surrounding and scolding a single African-American student in the hallway (one boy and one girl on separate occasions).  (Moore Decl. [82-1] ¶ 3; Moore Dep. of Nov. 4, 2020 [77] 42-49; Moore Dep. of Nov. 5, 2020, Ex. 16 [78-8].)  According to plaintiff, she also complained to Ms. Young that a Caucasian teacher told an African-American student something to the effect of:  "This is why y'all are getting shot by the police now, because you don't know how to do something the first time you are asked."  (PSAF ¶ 1, as modified by R-PSAF ¶ 1; Moore Decl. [82-1] ¶ 3; Moore Dep. of Nov. 5, 2020, Ex. 16 [78-8]; see also Young Dep. [80] 27-27.)  Plaintiff asked Ms. Young if the staff could have ethnicity training for the next school year so "staff members could better communicate with each other as well as [] students and kind of understand where everybody's coming from a little better."

9

(R-DSMF ¶ 25, quoting Moore Dep. of Nov. 4, 2020 [77] 49; <u>see also</u> DSMF ¶ 27, as modified by R-DSMF ¶ 27.)[11]

Plaintiff also asked Assistant Principal Dreina Gary-Robinson (African-American) for her support to have ethnicity training and she stated that she would talk to Ms. Young about it.  (DSMF ¶ 27, as modified by R-DSMF ¶ 27; <u>see also</u> Moore Dep. of Nov. 4, 2020 [77] 49.)  According to plaintiff, she believed that ethnicity training would address "[t]he way that [School] staff communicates with each other as well as to [] students.  The way [staff] treat each other as well as the way [staff] treat [] students."  (Moore Dep. of Nov. 4, 2020 [77] 66; <u>see also</u> DSMF ¶ 27, as modified by R-DSMF ¶ 27.)

### D.    August 2017 Complaint Regarding Student Treatment

In early August of the 2017-2018 school year, plaintiff asked two of her African-American students to return a cup to a fellow teacher.  (Young Dep. [80]

---

[11] The Court sustains plaintiff's objection to DSMF ¶ 26, proposing that Ms. Young investigated plaintiff's complaint about the treatment of African-American students and found it unsubstantiated.  (R-DSMF ¶ 26.)  The record cited does not support the proposed fact and, indeed, DSMF ¶ 26 conflates at least two separate incidents involving the treatment of minority students by Caucasian teachers. Moreover, nowhere in the portion of Ms. Young's deposition cited in support of the proposed fact does she state that plaintiff's complaint was unsubstantiated.  (<u>See</u> Young Dep. [80] 16-22, 27-31.)  Rather, the teacher involved in the most egregious incident was disciplined.  (<u>See</u> <u>id.</u> at 29-30.)

53-56 & Ex. 4 [80-5], at 2.)  Assistant Principal April Gwyn (Caucasian) returned those students to plaintiff and gave her the impression that the students had been disruptive.  (Young Dep. [80] 54-55 & Ex. 4 [80-5], 1-2.)  On August 3, 2018, plaintiff and Ms. Gwyn emailed each other several times regarding the incident, and plaintiff objected to Ms. Gwyn's characterization of the students' behavior. (Young Dep. [80] 54-56 & Ex. 4 [80-5], at 1-2.)  Ms. Young was copied during the email exchange.  (Id.)  Notably, the students' race was not mentioned in those emails.  (Id.)  Rather, Ms. Gwyn took issue with plaintiff's use of students to perform her personal errands, citing multiple incidents of the same during the first week of school.  (Young Dep. Ex. 4 [80-5], at 1.)  Ms. Gwyn admonished plaintiff that her response was "unnecessary and [] borderline insubordinate."  (Id.)  Ms. Young later spoke with Ms. Gwyn and plaintiff about the situation and told them that the conversation was over and to stop emailing back and forth about the issue and speak in-person if necessary.  (Young Dep. [80] 57-59.)

11

### E.      Absences During the 2017-2018 School Year

At the beginning of the 2017-2018 school year, plaintiff took sick leave on August 3, 24, and 25, 2017[12] and unpaid leave on August 25, 28, and 29.  (Young Dep. Ex. 8 [80-9].)[13]  On August 31, plaintiff emailed Mses. Young and Mitchell explaining that she missed four days of work the week before due to "feeling ill" and had visited her doctor and received a diagnosis for her condition.  (Id. Ex. 5 [80-6].)  Plaintiff explained that she did not wish to reveal her diagnosis at that time but explained that "it is of a serious nature" and that she "was immediately placed on a medical treatment plan and prescribed medication" which she was "currently taking."  (Id.)

Plaintiff again took unpaid leave on September 1, 5, and 15, 2017.  (Young Dep. Ex. 8 [80-9].)   On September 5, plaintiff received the following email regarding her absences from Ms. Young:

> Ms. Moore, I am available to meet with you on Thursday September, 7th at 10:00AM.  In addition to what you would like to speak with me about; we also need to discuss your absenteeism.  Maybe that is what

---

[12] On August 25, 2017, plaintiff took 6 hours of sick leave and 1.5 hours of unpaid leave.  (Young Dep. Ex. 8 [80-9].)

[13] August 24, 2017 fell on a Thursday; therefore, plaintiff missed four consecutive workdays from Thursday, August 24 through Tuesday, August 29, 2017.  (See Moore Dep. of Nov. 4, 2020, Ex. 3 [77-4] (email from Ms. Young stating that September 7, 2017 fell on a Thursday).)

12

you would like to discuss as well.  As of today 9/5/17 you have already taken a total of 6+ days of short[-]term leave; which according to the Cobb County School District is the level of absenteeism that is considered excessive and unacceptable for 190 day employee, and warrants a letter of concern on the seventh day of absence.  Short-term leave is available to take when you or your immediate family is ill.  We all fall ill sometimes.  It is important that you provide notices for documentation whenever you are absent from work.  I look forward to speaking with you on Thursday and I wish you well.

(Moore Dep. of Nov. 4, 2020, Ex. 3 [77-4]; see also DSMF ¶ 28, as modified by R-DSMF ¶ 28.)

Plaintiff eventually told Ms. Young that she had been diagnosed with anxiety, panic disorder, and attention deficit hyperactivity disorder.  (Moore Decl. [82-1] ¶ 14 & Ex. A; Moore Dep. of Nov. 4, 2020 [77] 72-80.)  Plaintiff takes three different medications for those disorders.  (Moore Decl. [82-1] ¶ 4.)  She also told Ms. Young about her symptoms—severe chest pains, problems breathing, and blurry vision.  (Id. ¶ 5.)  On September 19, 2017, plaintiff requested, and the District later approved, FMLA leave for her beginning September 18 through October 30, 2017.  (DSMF ¶ 29.)[14]

_____

[14] The Court excludes DSMF ¶ 30, proposing that all of plaintiff's requested FMLA leave was approved, because it is redundant of DSMF ¶ 29.  Moreover, viewing the facts in the light most favorable to plaintiff, it appears that she sought additional FMLA leave that was not approved.  (See R-DSMF ¶ 30.)

On November 16, 2017, plaintiff received the following email regarding her

absences from Ms. Young:

> This email is to serve as documentation noting the number of days, outside of your FMLA, that you have been absent from work this contract year for the 2017-2018.  Please note that you have taken a total of **Approx. 8.25 sick leave** days, as of November 14, 2017; which has reached the level of absenteeism that is considered excessive and unacceptable in the Cobb County School District.
>
> Just a reminder that according to CCSD (Rule GCQF). "Absences in excess of 6.5 days for 190 day employees may result in corrective action consistent with progressive discipline."
>
> Also know that it is good practice[] to provide medical documentation to your supervisor upon your return to work.
>
> At this time a letter of concern for absences will be placed in your file. Please meet with me tomorrow at 10:00AM to receive a copy and to discuss the letter.

(Moore Dep. of Nov. 4, 2020, Ex. 9 [77-9].)[15]  On November 30, plaintiff notified

Ms. Young that she was seeking FMLA leave for her November 17 absence, and

Ms. Young approved that request on December 5.  (Young Dep. Ex. 18 [80-19].)

---

[15] The Court sustains plaintiff's objection to DSMF ¶ 31 as unsupported by the record citation because the proposed fact inaccurately summarizes the email set forth in the paragraph preceding this note.  (See R-DSMF ¶ 31.)  The Court quotes the email above to accurately state its contents.

On December 6, 2017, the District approved plaintiff for intermittent FMLA leave from October 31, 2017 through September 19, 2018.  (DSMF ¶ 32.)[16]  The intermittent leave retroactively began when plaintiff's original leave ended.  (Id.)  However, plaintiff testified that she was instructed to change her intermittent FMLA leave paperwork to remove her request for FMLA protection "backdated through the September dates that were from the beginning of the school year" when she was seeking a medical diagnosis in order for her request to be approved. (Moore Dep. of Nov. 5, 2020 [78] 27-30; see also Moore Dep. of Nov. 4, 2020 [77] 97-101; see also R-DSMF ¶ 34.)

After Ms. Young learned that plaintiff's request for intermittent FMLA leave was granted, she removed the November 16, 2017 email from plaintiff's file. (DSMF ¶ 34, as modified by R-DSMF ¶ 34.)  Likewise, absences which occurred during that approved leave were retroactively removed from the count of plaintiff's non-FMLA covered absences.  (Id.)  However, absences which occurred before the

---

[16] The Court excludes DSMF ¶ 33, proposing that all of plaintiff's requested intermittent FMLA leave was approved, because it is redundant of DSMF ¶ 32. Moreover, viewing the facts in the light most favorable to plaintiff, it appears that she sought additional FMLA leave that was not approved.  (See R-DSMF ¶ 33.)

15

above approved FMLA leave periods continued to count against plaintiff.  (Young

Dep. [80] 103-04; <u>see also</u> R-DSMF ¶ 34.)

### F.    Accommodations During the 2017-2018 School Year

The District gave plaintiff the accommodation of taking "breaks as needed."

(DSMF ¶ 35, as modified by R-DSMF ¶ 35.)  Ms. Mitchell asked plaintiff to let her

or Ms. Young know when she was having an episode; however, that would require

plaintiff to send an e-mail to them during a time when she was physically unable

to do so.  (DSMF ¶ 35, as modified by R-DSMF ¶ 35; <u>see also</u> R-DSMF ¶ 36[17];

Moore Dep. of Nov. 5, 2020 [78] 32-34.)  Plaintiff would tell Mses. Young and

Mitchell <u>after</u> an episode.  (Moore Dep. of Nov. 5, 2020 [78] 33-34.)

In her declaration, Ms. Young explained that "there was a concern for both

student safety and as well as for providing adequate instruction for Ms. Moore's

unsupervised students" when she left her classroom.  (Young Decl. [58-3] ¶ 21.)

However, plaintiff did not leave her students unattended when she experienced a

---

[17] The Court sustains plaintiff's objection to DSMF ¶ 36, which proposes that plaintiff failed to follow Ms. Mitchell's instruction to inform her or Ms. Young when she was taking a break.  (<u>See</u> R-DSMF ¶ 36.)  That proposed fact is not supported by the record citation.  (<u>Compare</u> DSMF ¶ 36, <u>with</u> Moore Dep. of Nov. 5, 2020 [78] 33-34.)  Rather, as explained in the paragraph preceding this note, plaintiff was unable to email anyone during a panic attack and informed her superiors after the episode.  (Moore Dep. of Nov. 5, 2020 [78] 33-34.)

16

panic attack.  (Moore Decl. [82-1] ¶ 13.)[18]  Plaintiff rarely had such an episode while teaching, but they did occur a few times after plaintiff met with administrators and returned directly to class or was being observed by administrators.  (Id.)  Mses. Young and Mitchell caused plaintiff great "anxiety." (Id.)  If plaintiff felt that she was going to have an episode, she would prompt her students to start their independent work and knock on the door of the teacher across the hall and ask her to sit at her door and watch both classrooms until plaintiff returned.  (Id.)

Ms. Young denies she received an accommodation because taking breaks came with consequences.  (R-DSMF ¶ 35; Moore Dep. of Nov. 5, 2020 [78] 32-34.)  For example, Ms. Mitchell would see plaintiff sitting somewhere while she was having a panic attack; Ms. Mitchell would then return to her office and send plaintiff an e-mail stating that she was not at a certain place or doing a certain thing.

---

[18] The Court sustains plaintiff's objection to DSMF ¶ 37, proposing that when plaintiff left her classroom unattended there was a concern for student safety and the provision of adequate instruction.  (R-DSMF ¶ 37.)  Plaintiff rebuts the proposed fact by declaring that she never left her students unattended, that they were assigned independent work to perform until she could return, and that they were supervised by another teacher.  (Id.)  At this stage of the litigation, the Court must view the facts in the light most favorable to plaintiff as the non-movant.  Thus, it accepts her version of the events over Ms. Young's.  (Compare Moore Decl. [82-1] ¶ 13, with Young Decl. [58-3] ¶ 21.)

(DSMF ¶ 35, as modified by R-DSMF ¶ 35; Moore Dep. of Nov. 5, 2020 [78] 32-34.)

Additionally, Ms. Mitchell reported consistently having difficulty locating lesson plans[19] for plaintiff's substitute teachers when plaintiff was absent from the classroom during the 2017-2018 school year. (DSMF ¶ 13.)[20] However, plaintiff informed Ms. Mitchell that she was locked out of the online portal and could not electronically submit her lesson plans. (R-DSMF ¶ 13; Moore Dep. of Nov. 5, 2020 [78] 51, 59.) Thus, Ms. Mitchell instructed plaintiff to email the tech person and to keep a hard copy of her lesson plans. (R-DSMF ¶ 13; Moore Dep. of Nov. 5, 2020 [78] 59.)

Plaintiff had lesson plans readily available at all times that she was not out on long-term leave. (R-DSMF ¶ 14.) Plaintiff testified that she left her lesson plans in a binder in her classroom and that "they were always where I left them except

_____

[19] Lesson plans are necessary to provide appropriate instruction for plaintiff's students during her absence. (DSMF ¶ 13.) Teachers are expected to have lesson plans readily available in case they are unexpectedly absent from the classroom. (Id. ¶ 14.)

[20] Plaintiff admits that Ms. Mitchell testified that she had difficulty locating lesson plans for plaintiff's substitute teachers, but denies DSMF ¶ 13 as inaccurately presenting the circumstances regarding the missing plans. Thus, the Court restates the additional background facts set forth in R-DSMF ¶ 13 and includes additional relevant information from plaintiff's deposition testimony.

for the times Ms. Mitchell emailed [plaintiff] that she couldn't find [them]."
(Moore Dep. of Nov. 5, 2020 [78] 11; see also id. at 9-11 (plaintiff testified that
she noticed things missing and moved in her classroom, including lesson plans);
R-DSMF ¶ 13.)

### G.    2017-2018 Performance Evaluations

During the 2017-2018 school year, Ms. Moore taught remedial math.
(Young Dep. [80] 98.)  This was the same class that she taught during the 2016-
2017 school year (id.) and she used the same lesson plans both years (PSAF ¶ 6.)
At the end of the 2016-2017 school year, Ms. Moore received a Summative
Assessment score of 25 and a Level III rating.  (Young Dep. Ex. 2 [80-3] (May 3,
2017 Summative Assessment).)

Unlike past school years, Ms. Moore did not choose the dates she would be
observed during the 2017-2018 school year, and was not notified of what standards
observers were looking at that year or how many standards would be considered.
(PSAF ¶ 4, as modified by R-PSAF ¶ 4; Moore Dep. of Nov. 5, 2020 [78] 61-62.)
During the 2017-2018 school year, plaintiff received multiple informal and formal
performance evaluations from Mses. Young, Mitchell, Gary-Robinson, and Gwyn,
including but not limited to, the following:

> (a) On or about November 30, 2017, plaintiff was observed and
> evaluated and assigned five Level II ratings in the standards of

Instructional Planning, Differentiated Instruction, Assessment Uses, Professionalism, and Communication.  She was assigned a Level II rating for Professionalism and that section included, inter alia, the following comment:  "Ms. Moore has also been cautioned about her attendance."

(b)   On or about December 20, 2017, plaintiff was observed and evaluated and assigned four Level II ratings in Instructional Planning, Differentiated Instruction, Assessment Uses, and Professionalism.

(c)   On or about January 26, 2018, plaintiff was observed and evaluated and assigned a Level II rating in instructional planning, noting that she failed to perform her essential duty of maintaining lesson plans in accordance with school district policies and directives.

(DSMF ¶ 12, as modified by R-DSMF ¶ 12 (objecting to the term "earned," which the Court replaced with "assigned"); Young Decl. Ex. 4 [58-3], at 22.)[21]  Ms. Moore was rated at a Level II with an assigned a score of 15 out of a possible 30 points on her mid-year or "formative" evaluation for the 2017-2018 school year.  (DSMF ¶

---

[21] Plaintiff objects to DSMF ¶ 12 as an immaterial compound fact and disputes the relevance of those evaluations.  (R-DSMF ¶ 12.)  The Court notes that defendant only stated 44 proposed facts and thus would have been able to separate DSMF ¶ 12 into 4 separate proposed facts and remain within the 50-fact limit set forth in the Court's January 16, 2020 Order [14].  The Court overrules plaintiff's other objections as argumentative.

17, as modified by R-DSMF ¶ 17;[22] Young Dep. [80] 43-44; see also Young Decl. [58-3] ¶ 13.)

Ms. Young placed plaintiff on a remediation plan following her mid-year evaluation.   (DSMF ¶ 19; R-DSMF ¶ 19, only admitting placement on a remediation plan.)  According to Ms. Young, she believed plaintiff was struggling in her performance at the beginning of 2017 and wanted to help plaintiff by placing her on a remediation plan, which included weekly feedback and classroom walk-throughs.  (DSMF ¶ 19; see also Young Dep. [80] 76, 116, 126.)[23]  Plaintiff testified in her deposition that when she returned from leave, "it was pretty clear they didn't

---

[22] Plaintiff denies DSMF ¶ 17's proposition that she "earned" a score of 15 on her mid-year evaluation and that her score was based on the documented evaluations of those named in the proposed fact.  (R-DSMF ¶ 17.)  The Court sustains her objection, as the fact is only supported in part by the referenced citation and modifies the proposed fact to address plaintiff's objections.  (Compare DSMF ¶ 17, with Young Decl. [58-3] ¶ 13.)

[23] Plaintiff denies DSMF ¶ 19's proposed account of her performance and why Ms. Young placed her on a remediation plan.  (R-DSMF ¶ 19.)  At this stage of the litigation, the Court must view the facts in the light most favorable to plaintiff.  The Court overrules plaintiff's objection as argumentative and accepts Ms. Young's testimony as evidence of what she may have told the District and documented regarding her motives.  However, the Court also includes plaintiff's testimony regarding why Ms. Young placed her on a remediation plan.  The Court may not make a credibility determination at this stage of the litigation and, should the outcome of the instant Motion turn on crediting one or the other, then the Court will credit plaintiff here and a jury must determine whom to believe at trial.

21

want me there and they used my remediation plan to get me out of school." (Moore Dep. of Nov. 5, 2020 [78] 18.)  According to plaintiff, Ms. Young would request things from her in the remediation plan, and even when she met them, it never satisfied Ms. Young.  (Id.)  By way of example, plaintiff explained:

> Even when I did exactly how she said do it, and then she would have me go meet with another administrator and they would tell me to do it a different way and I would do it that way and it was still [un]satisfactory. I was meeting with a math coach once a week doing things the way she said do them and it was still unsatisfactory.

(Id.)  Plaintiff believed that regardless of what she did on the remediation plan, she would be unsuccessful.  (Id.)

On January 31, 2018, Ms. Gary-Robinson observed Ms. Moore in class and took observation notes which she provided to Ms. Young.  (PSAF ¶ 1, as modified by R-PSAF ¶ 1; Gary-Robinson Dep. [72] 40-41 & Ex. 2 [72-2]; Young Dep. Ex. 10 [80-11].)  Ms. Gary-Robinson wrote nothing negative in the observation and included comments such as: "Students are working in collaborative groups on workbook assignments.  As Ms. Moore is walking and answer[ing] question a student asked about a problem she was solving."; "Instructional plans reflect exactly what was done in class today."; "[Ms. Moore] summarized the lesson by asking the students about the lesson and the activity."; "Groups had roles . . ."; "Students are comfortable in class and openly share."  (Gary-Robinson Dep. [72]

22

40-41 & Ex. 2 [72-2]; Young Dep. Ex. 10 [80-11].)  Ms. Gary-Robinson testified in her deposition that she does not recall giving Ms. Moore any ratings as a result of the observation or entering it into the TKES platform and did not believe that the observation went into the platform.  (PSAF ¶ 3, as modified by R-PSAF ¶ 3; Gary-Robinson Dep. [72] 40-41.)

### H.    2017 Grievances and 2018 Formal Complaint

On December 20, 2017, plaintiff filed a Certified Employee Grievance Form - Level I.[24]  (Moore Dep. of Nov. 5, 2020, Ex. 11 [78-3].)  Plaintiff alleged that Ms. Young was retaliating against her for exercising her rights under the FMLA.  (Id.)  Plaintiff asserted that Ms. Young retaliated against her and harassed her for using FMLA leave by issuing plaintiff a letter of direction regarding her attendance, giving her lower rankings on her mid-year formative evaluation,[25] and increasing the number of times plaintiff would be observed during the school year.  (Id.)  On

---

[24] Plaintiff objects to DSMF ¶ 38, summarizing plaintiff's December 20, 2017 grievance and the District's subsequent letter denying it.  (R-DSMF ¶ 38.)  The Court sustains that objection in part because defendant only cites the letter of denial, which does not fully support the proposed fact.  In order to provide sufficient background, the Court summarizes and cites plaintiff's grievance before addressing the District's response thereto.

[25] On a November 30, 2017 evaluation, Ms. Young rated plaintiff a Level II on the professionalism standard and commented, inter alia, that "Ms. Moore has also been cautioned about her attendance."  (Young Dep. Ex. 9 [80-10], at 5.)

December 21, the District denied plaintiff's grievance on the grounds that it concerned matters excluded from the formal grievance process, including "performance evaluations, performance ratings, job performance issues, and the reprimand of any employee."[26]  (DSMF ¶ 38, as modified by R-DSMF ¶ 38; Moore Dep. of Nov. 5, 2020, Ex. 12 [78-4].)

On December 30, 2017, plaintiff filed a Level II appeal to Dr. Robert Downs, who denied it on the same grounds but informed plaintiff that the District had a separate process for filing a complaint about discriminatory acts, including retaliation.  (DSMF ¶ 39.)  On January 16, 2018, District Employee Relations emailed plaintiff information and forms for filing a complaint of discrimination.  (Id. ¶ 40.)

On February 2, 2018, plaintiff completed an "Employee Discrimination Complaint Form," alleging that Ms. Young discriminated against her based on race, disability, and the need for medical leave, and that Ms. Young engaged in retaliation by, inter alia, placing her on a remediation plan and increased observation schedule.  (DSMF ¶ 41, as modified by R-DSMF ¶ 41; Moore Dep. of

---

[26] Ms. Young received an email from Christopher Dowd, Director of Employee Relations, regarding her deadline for responding to plaintiff's initial grievance.  (Rynearson Dep. Ex. 2 [79-3].)

24

Nov. 5, 2020, Ex. 16 [78-8].)  Plaintiff also alleged that she was being retaliated against for requesting ethnicity training, complaining about several incidents of discriminatory treatment of African-American students, and for exercising her rights under the FMLA.  (Moore Dep. of Nov. 5, 2020, Ex. 16 [78-8].)

In her February 2, 2018 formal complaint, plaintiff described four incidents she believed were racially motivated discrimination against African-American students.  (Moore Dep. of Nov. 5, 2020, Ex. 16 [78-8].)  The first two incidents both involved three Caucasian teachers surrounding and scolding an African-American student in the hallway.  (Id.)  The third incident involved a racially-charged remark made by a Caucasian teacher to an African-American student during class.[27]  (Id.)  Those three incidents occurred during the 2016-2017 school year and precipitated plaintiff's request that staff receive ethnicity training.  (Id.)  The last incident she described occurred at the beginning of the 2017-2018 school year and involved two of plaintiff's African-American students, whom she asked to return a cup to a fellow teacher.  (Id.)  Ms. Gwyn returned the students to plaintiff's classroom and told her they were being disruptive in the hallway.  (Id.)

---

[27] Defendant disciplined the teacher involved in the incident described in the sentence preceding this note.  (See Young Dep. [80] 29-30.)

25

As a result, plaintiff gave the students a verbal warning and called her fellow teacher to apologize for their behavior, only to learn that the students had not been disruptive.  (Id.)  Plaintiff described confronting Ms. Gwyn via email about her alleged deception and later spoke with Ms. Young about the incident and commented: "It's always the black kids."  (Id.)  According to plaintiff, Ms. Young said that she knew, that she appreciated how plaintiff stood up for her students, and that she would address the issue with Ms. Gwyn but that their emails needed to stop.  (Id.)  Plaintiff stated in her formal complaint that Ms. Young did nothing in response.  (Id.)

Robert Rynearson with the District's Human Resources Department investigated plaintiff's allegations of discrimination toward students and of retaliation.  (DSMF ¶ 42;[28] Rynearson Dep. [79] 32.)  In connection with that investigation, Mr. Rynearson interviewed plaintiff on February 15, 2018, Ms. Mitchell on February 16, and Ms. Young on March 1.  (DSMF ¶ 42, as modified

---

[28] The Court overrules in part plaintiff's objections to DSMF ¶ 42, in which she contends that Mr. Rynearson's investigation was biased and deficient, as those objections are argumentative.  (See R-DSMF ¶ 42.)

by R-DSMF ¶ 42; Rynearson Dep. [79] 14, 39-40 & Ex. 5 [79-5].)[29]  On March 6, 2018, the Human Resources Department issued a report finding that plaintiff's complaint was not substantiated by the investigation.  (DSMF ¶ 43.)

### I.   2018 Summative Assessment and Non-Renewal

The District begins the contract renewal process in January or February,[30] and at that time asks principals for the names of teachers who have scored less than a 17 on their current formative assessments or the names of teachers who are working on remediation plans because their scores from the prior year were a Level I or II.  (Young Dep. [80] 39.)[31]  During the 2017-2018 school year, when it was time for contracts to go out, Ms. Young advised Human Resources that Ms. Moore was being assessed at a Level II and/or that she was on a remediation plan.  (Id. at

---

[29] The Court sustains in part plaintiff's objection to DSMF ¶ 42 as unsupported by the record evidence and modifies the portion of that fact set forth in the sentence preceding this note to accurately summarize Mr. Rynearson's deposition testimony regarding the people he interviewed as part of his investigation.  (See R-DSMF ¶ 42.)

[30] According to Mr. Rynearson, defendant releases the first round of contracts "fairly early in February."  (Rynearson Dep. [79] 69.)

[31] The Court sustains plaintiff's objection to DSMF ¶ 18, proposing why plaintiff's contract was nonrenewed, because that proposed fact is unsupported by the record citation.  (R-DSMF ¶ 18.)  The Court summarizes Ms. Young's testimony regarding her understanding of the contract renewal process and what she reported to Human Resources in that regard concerning plaintiff.

41.)  According to Ms. Young, if a teacher is at a Level I or II for the Summative Assessment, she/he may not be offered a contract.  (Id. at 43.)

On April 19, 2018, Ms. Young rated plaintiff on all ten performance standards for her Summative Assessment, with five standards rated Level II, the remaining five standards rated Level III, and an overall rating of Level II. [32] Notably, Ms. Young rated plaintiff as a Level II on the Professionalism standard and commented that plaintiff was "inconsistent with some duties and responsibilities, local procedures and protocols."  (DSMF ¶ 21, as modified by R-DSMF ¶ 21; Young Dep. Ex. 21 [80-22] (Apr. 19, 2018 Summative Assessment).) [33] Ms. Young made the final decision not to renew plaintiff's contract using the District's evaluation process and guided by the ratings assigned to plaintiff throughout the school year, her overall knowledge of plaintiff's performance, and

_____

[32] The parties dispute why Ms. Young rated plaintiff at the Levels set forth in the sentence preceding this note.  Rather than address Ms. Young's possible motives, the Court excludes that proposed fact and summarizes the Summative Assessment above.  (Compare DSMF ¶ 22 (stating that the above ratings were the result of plaintiff's failure), with R-DSMF ¶ 22 (stating that the ratings were retaliatory).)

[33] The Court sustains in part plaintiff's objection to DSMF ¶ 21, because the later portion of that proposed fact is not supported by the record citation.  (See R-DSMF ¶ 21, citing Pl. Ex. E [61-7], at 21-22 (defining Level II rating as "Needs Development").)

28

plaintiff's Level II rating on the mid-year formative evaluation and the final Summative Assessment.   (Young Dep. [80] 43-53.)   On May 11, the District notified plaintiff that it would not renew her teaching contract for the 2018-2019 school year.   (Young Decl. [58-3] ¶ 14 & Ex. 7, at 30.)[34]

## J.   EEOC Charge

On May 7, 2018, plaintiff filed a Charge of Discrimination against the District with the Equal Employment Opportunity Commission ("EEOC"). (Compl. Ex. A [1-1].)   Plaintiff asserted that she was being retaliated against for complaining about the alleged discriminatory treatment of African-American students, exercising her rights under the FMLA, and due to her disability.   (Id.) Plaintiff explained that Ms. Young gave her a Level II score on her Summative Assessment, which would be classified as unsatisfactory by the District and likely result in a loss of a step increase in pay.   (Id.)   Plaintiff also alleged that the retaliation and discrimination was a "continuing action."   (Id.)   The EEOC mailed plaintiff a Notice of Right to Sue on June 17, 2019.   (Id. Ex. B [1-2].)   Plaintiff

---

[34] The Court sustains plaintiff's objection to DSMF ¶ 23 because the record citation does not support the proposed fact.   (See R-DSMF ¶ 23.)   The Court notes that defendant cites to an exhibit that does not exist (i.e., Ms. Young's Declaration only has 10 exhibits, but defendant cites to Exhibit 14).

received the notice on June 26, 2019 and filed the instant Complaint on September 16, 2019.  (Id. ¶ 7.)

## II.   <u>STANDARD OF REVIEW</u>

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>See</u> Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." <u>Rice-Lamar v. City of Fort Lauderdale</u>, 232 F.3d 836, 840 (11th Cir. 2000) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  Those materials may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991).

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial."

Celotex, 477 U.S. at 324.  Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  If in response the non-moving party does not sufficiently support an essential element of his case as to which he bears the burden of proof, summary judgment is appropriate.  Rice-Lamar, 232 F.3d at 840.  "In determining whether genuine issues of material fact exist, [the Court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party."  Id. (citing Anderson, 477 U.S. at 255).

In deciding a summary judgment motion, the court's function is not to resolve issues of material fact but rather to determine whether there are any such issues to be tried.  Anderson, 477 U.S. at 250.  The applicable substantive law will identify those facts that are material.  Id. at 248.  Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment.  Id.  Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  For factual issues to be "genuine," they must have a real basis in the record.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

31

(1986).  When the record as a whole could not lead a rational trier of fact to find for the non-movant, there is no "genuine issue for trial."  Id. at 587.

## III.   DISCUSSION

### A.    FMLA Claims (Counts One and Two)

Plaintiff alleges that defendant interfered with the exercise of her rights under the FMLA (Count One) and retaliated against her for taking leave (Count Two) by using protected absences as a basis for adverse actions, failing to reasonably accommodate her, reprimanding her for necessary breaks, providing unjustified negative evaluations, placing her on a remediation plan and ultimately declining to renew her contract, i.e., terminating her.  (Compl. ¶¶ 79, 85.)

Congress enacted the FMLA in part to address problems arising from "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods."  29 U.S.C. § 2601(a)(4). Congress designed the Act to provide a balance between "entitl[ing] employees to take reasonable leave for medical reasons" and "accomodat[ing] the legitimate interests of employers."  Id. § 2601(b)(2)-(3).  "The FMLA grants an eligible employee the right to take up to 12 workweeks of unpaid leave annually for any one or more of several reasons, including 'because of a serious health condition that makes the employee unable to perform the functions of the position of such

employee.'" Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1293 (11th Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)).  A "serious health condition" denotes "an illness, injury, impairment, or physical or mental condition that involves--(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."[35]  29 U.S.C. § 2611(11); see also 29 C.F.R. § 825.113 (defining "serious health condition"); Pivac v. Component Servs. & Logistics, Inc., 570 F. App'x 899, 902 (11th Cir. 2014) (per curiam) (noting that FMLA interference and retaliation claims both require a plaintiff to establish that he suffered from a "serious health condition.").

To preserve the availability of FMLA rights, and to enforce them, the Act creates two types of claims:  (1) interference claims, in which an employee asserts that her employer denied or otherwise interfered with her substantive rights under the Act, and (2) retaliation claims, in which an employee asserts that her employer discriminated against her because she engaged in activity protected by the Act.

---

[35] Continuing treatment includes "[a] period of incapacity of more than three consecutive, full calendar days" and any subsequent related treatment which also involves treatment by a health care provider two or more times within 30 days of the first day of incapacity or treatment by a health care provider on a least one occasion resulting in a regimen of continuing treatment under the provider.  29 C.F.R. § 825.115(a)(1)-(2).

Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1206 (11th Cir. 2001);

see also 29 U.S.C. § 2615 (prohibiting employer from interference with FMLA

rights). The Court addresses plaintiff's FMLA interference and retaliation claims

in turn below.

### 1.    FMLA Interference (Count One)

Defendant argues that plaintiff's FMLA interference claim must fail because

it granted her all the FMLA leave she requested and therefore did not deny her any

benefits to which she was entitled. (Def. Mem. [58-1] 5; Def. Reply [65] 2-4.)

Defendant also contends that it did not use plaintiff's protected absences against

her because Ms. Young rescinded the November 16, 2017 letter of direction

regarding those dates; thus, it had no impact on plaintiff's employment. (Def. Mem.

5; Def. Reply 4.) Defendant contends that plaintiff's claims of other negative

consequences (e.g., reprimanding her for breaks, termination) did not interfere with

her FMLA leave and are allegations of retaliation that fall under Count Two of the

Complaint.[36] (Def. Mem. 6; Def. Reply 3-4.) Regardless, defendant argues that

---

[36] The undersigned agrees and considers plaintiff's allegations regarding defendant's treatment of her after she requested FMLA leave and exercised her rights under the Act infra Part III.A.2, as part of her FMLA retaliation claims.

34

plaintiff has proffered no proof that her request for leave was the proximate cause of the alleged wrongful conduct.  (Def. Mem. 6.)

Plaintiff responds that defendant interfered with her FMLA rights by denying her FMLA leave for the days in August and September 2017 during which she was seeking a medical diagnosis, by using those days against her in her evaluation ratings and eventual nonrenewal, and by reprimanding her for taking intermittent FMLA protected breaks.  (Pl. Resp. [61] 20-21.)  Plaintiff contends that she made defendant aware that she was seeking treatment for a serious health condition and advised defendant of her diagnosis.  (Id. at 21.)  Yet, in a November 30, 2017 evaluation, Ms. Young noted that she had cautioned plaintiff about her attendance  (Young Dep. Ex. 9 [80-10], at 5) and in the Summative Assessment Ms. Young gave plaintiff a Level II rating on Professionalism (the standard related to absenteeism).  (Young Dep. [80] 105; Moore Dep. of Nov. 5, 2020 Ex. 19 [78-11], at 2-3.)

Under the FMLA's anti-interference provision, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under the [FMLA]."  29 U.S.C. § 2615(a)(1).  To state an interference claim, "an employee need only demonstrate by a preponderance of the evidence that [she] was entitled to the benefit denied."  Strickland, 239 F.3d at

1206-07.  That is, the employee need not allege that [her] employer intended to deny the benefit, because "the employer's motives are irrelevant."  Id. at 1208.

Where an employee's need for FMLA leave due to a serious medical condition is unforeseeable the advance notice requirement does not apply, and "the employee need only provide her employer with notice sufficient to make the employer aware that her absence is due to a potentially FMLA-qualifying reason." Gay v. Gilman Paper Co., 125 F.3d 1432, 1436 (11th Cir. 1997).  An employee taking unforeseeable leave "need not expressly assert rights under the FMLA or even mention the FMLA" but may only state that leave is needed.  29 C.F.R. § 825.303(b).  Once an employee taking unforeseeable leave informs her employer that potentially FMLA-qualifying leave is needed, the regulations place on the employer the burden of ascertaining whether the employee's absence actually qualifies for FMLA protection.  See id. ("The employer will be expected to obtain any additional required information through informal means.").

Viewing the facts in the light most favorable to plaintiff, she suffered an unforeseeable medical condition and provided sufficient information to Mses. Young and Mitchell soon thereafter to put defendant on notice that her extended absence from August 24 through August 29, 2017 and subsequent absences on September 1, 5, and 15 may qualify for protection under the FMLA as a serious

36

health condition involving continuous treatment by a healthcare provider and subsequent related treatment within 30 days of her initial incapacity.  See 29 C.F.R. 825.115(a)(1)-(2).  Therefore, plaintiff's August 31, 2017 email to her supervisors triggered defendant's duties under the FMLA, and the burden shifted to the District to obtain more information and determine whether those absences qualified for FMLA protection.  (See Young Dep. Ex. 5 [80-6] (Aug. 31, 2017 email by plaintiff to Mses. Young and Mitchell) & Ex. 8 [80-9].)

Rather than fulfill defendant's duty of informally gathering additional information to determine whether those absences qualified for protection under the FMLA, Ms. Young chastised plaintiff in a September 5, 2017 email for excessive absenteeism and sought a meeting with her to discuss the matter.  Furthermore, defendant repeatedly rejected plaintiff's attempts to apply for FMLA protection for those early absences.  According to plaintiff, defendant told her that it would not consider those absences for FMLA protection and instructed plaintiff to remove that portion of her request (along with requests for additional accommodations) in order for her intermittent FMLA leave request to be granted.  (See Moore Dep. of Nov. 5, 2020 [78] 27-30; Moore Dep. of Nov. 4, 2020 [77] 97-101.)

While it is undisputed that defendant granted plaintiff's reduced FMLA requests, viewing the facts in the light most favorable to her, defendant failed to

37

comply with its duties under the FMLA by ignoring plaintiff's initial multi-day absences after notice that they were due to a serious health condition, by failing to investigate the matter, and by denying plaintiff's attempts to request that those days be included in her FMLA-protected leave. Therefore, at this stage of the litigation, plaintiff has submitted probative evidence that she was entitled to the benefit denied and that defendant interfered with the exercise of her rights under the FMLA. Accordingly, the undersigned **RECOMMENDS** that defendant's Motion be **DENIED** as to plaintiff's FMLA interference claim set forth in Count One of the Complaint.

## 2.    FMLA Retaliation Claim (Count Two)

Defendant argues that plaintiff cannot establish a prima facie case of retaliation based on low evaluation scores, placement on a remediation plan, or communications following breaks because she cannot establish a causal connection between them and her FMLA leave. (Def. Mem. 8-12; Def. Reply 5.) Rather, defendant argues that plaintiff's consistent performance issues throughout the 2017-2018 school year (despite Ms. Young's attempts to help her)[37] serve as an

---

[37] Defendant also argues that the remediation plan was not an adverse action because it was not intended to harm her, but was Ms. Young's attempt to help plaintiff improve her performance deficiencies before the Summative Assessment

intervening act of misconduct culminating in plaintiff's unsatisfactory Summative Assessment and subsequent nonrenewal.  (Def. Mem. 8-10; Def. Reply 5-8.)

Additionally, while defendant admits that plaintiff can establish that she engaged in a statutorily protected activity and experienced a materially adverse action with regard to her September 19, 2017 FMLA leave request and later nonrenewal, it denies that she can establish a causal connection between those events given the eight-month lapse between them and her intervening performance issues.  (Def. Mem. 13-14.)  Finally, defendant argues that those performance issues, culminating in a Level II overall rating on plaintiff's Summative Assessment, suffice as legitimate non-retaliatory reasons for the all the alleged adverse actions and that plaintiff has produced no evidence of pretext or support for her assertion that defendant retaliated against her for taking FMLA leave.  (Id. at 8-14; Def. Reply 6-10.)

Plaintiff argues that defendant created a hostile work environment leading up to her termination which was so severe and pervasive as to alter the terms and

_____

at the end of the school year.  (Def. Mem. 9-10.)  Likewise, defendant contends that its requests for plaintiff to notify her supervisors when she took a break was simply an obligation that applied to all teachers and not a "reprimand" or adverse action.  (Id. at 11-12.)

conditions of her employment and which would have dissuaded a reasonable employee from engaging in protected activity. (Pl. Resp. 9-10.)  In support of those assertions, plaintiff contends that defendant used the remediation plan to observe her weekly and "get [her] out of school." (Id. at 10.)  Plaintiff also contends that when she complied with defendant's requests, her efforts were always deemed unsatisfactory and that administrators' actions caused her to have panic attacks. (Id.)  Plaintiff also argues that her protected activity was swiftly followed with adverse actions by defendant.  By way of example, plaintiff observes that Ms. Young admonished her immediately following her initial absences to seek medication treatment during the first month of the 2017-2018 school year. (Id. at 12-13.)  Likewise, she cites the dramatic shift in her ratings from one school year to the next and after her need for medical leave. (Id. at 13.)  Similarly, following her grievance, discrimination complaint, and appeal of her Summative Assessment, defendant chose not to renew her contract. (Id.)  Finally, plaintiff argues that defendant's citation to the low evaluation ratings assigned to her by Ms. Young do not constitute a reason for plaintiff's non-renewal and low ratings do not mandate termination, and that defendant has failed to proffer a definitive legitimate nondiscriminatory reason for the adverse action. (Id. at 14-17.)  By way of pretext, plaintiff cites to her lower ratings in 2017-2018 for lesson plans deemed proficient

40

the prior year, Ms. Young's ability to have plaintiff observed frequently and pick and choose which observations to enter into TKES, and other criticisms that plaintiff has disproven.  (Id. at 17-20.)

To prove FMLA retaliation, plaintiff must show that the District intentionally discriminated against her for exercising her right to medical leave.[38] See 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c).  In the absence of direct evidence supporting such a claim, courts apply the burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), for evaluating Title VII retaliatory discharge claims.  Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 798 (2000).  Thus, to establish a prima facie claim of retaliation under the FMLA, the plaintiff must show that "(1) the employee engaged in statutorily protected conduct," (2) she suffered a materially adverse action,[39] and "(3) there is a causal connection between the two."  Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1234 (11th Cir. 2010).

_____

[38] Unlike an interference claim, an employee "bringing a retaliation claim faces the increased burden of showing that [her] employer's actions were motivated by an impermissible retaliatory or discriminatory animus."  Strickland, 239 F.3d at 1207 (internal quotation marks and citation omitted).

[39] An adverse employment action in the context of a retaliation claim is an action by an employer that is "harmful to the point that [it] could well dissuade a

41

Requesting and taking FMLA leave is considered protected activity under the Act. See Jones v. Gulf Coast Health Care of Del., LLC, 854 F.3d 1261, 1271 (11th Cir. 2017) (taking FMLA leave is protected activity); Pereda v. Brookdale Senior Living Cmtys., Inc., 666 F.3d 1269, 1276 (11th Cir. 2012) (request for post-eligible FMLA leave is protected activity). Additionally, protected conduct includes an employee's complaints about or opposition to practices made unlawful under the FMLA, see 29 U.S.C. § 2615(a)(2), or participation in an inquiry or proceeding under the Act, see id. § 2615(b).[40]

_____

reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006); see also Martin v. Brevard Cty. Public Schs., 543 F.3d 1261, 1268 (11th Cir. 2008) (per curiam) (FMLA claims assessed under McDonnell Douglas framework). Thus, with the exception of defendant's decision to withhold plaintiff's contract in January or February 2018 and her termination in May 2018, the minor related events themselves do not constitute adverse actions.

[40] Although plaintiff filed an EEOC Charge on May 7, 2018 alleging discrimination and retaliation for exercising her rights under the FMLA, plaintiff has proffered no evidence that defendant or Ms. Young (the undisputed decision maker in her termination) knew of that Charge before making the decision to terminate her. See Krutzig, 602 F.3d at 1234-35 (causal connection element satisfied if plaintiff can show two events not wholly unrelated, e.g., if the decision maker was aware of the protected conduct at the time of the adverse employment action); see also Dugas v. St. Charles Cmty. Health Ctr., Inc., No. 11-135, 2011 WL 6934694, at *9 (E.D. La. Dec. 29, 2011) ("By its very nature, retaliation may occur only if the alleged perpetrator of the retaliation knows of some *prior* protected conduct that prompts the retaliation."). Accordingly, the undersigned **REPORTS** that plaintiff has not stated a claim under the participation clause.

When a plaintiff protests an employer's conduct which is actually lawful, she must demonstrate "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997). A plaintiff "must not only show that he *subjectively* . . . believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented." Id. "The objective reasonableness of an employee's belief that her employer engaged in an unlawful employment practice must be measured against existing substantive law." Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).

If the plaintiff establishes a prima facie case of retaliation under the McDonnell Douglas framework, then the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its action, and finally the burden will shift back to the plaintiff to establish that the proffered reason was pretext for retaliation.[41] Bartels v. S. Motors of Savannah, Inc., 681 F. App'x 834, 837-38

_____

[41] To demonstrate pretext, the plaintiff must provide evidence that "reveal(s) such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Vessels v. Atlanta Ind. Sch. Sys.,

(11th Cir. 2017) (per curiam).  Moreover, "[i]f a plaintiff's FMLA retaliation claim fails under this framework, [she] may nonetheless overcome summary judgment by providing a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Dobson v. Fulton Cty., Ga., No. 1:19-cv-00902-ELR-RVG, 2020 WL 5549246, at *11 n.15 (N.D. Ga. July 9, 2020) (internal quotation marks and citation omitted).

### a)     Plaintiff's FMLA Requests and Leave

Plaintiff alleges that defendant terminated her in retaliation for exercising her rights under the FMLA.  Here, as defendant concedes, plaintiff's initial September 19, 2017 FMLA leave request for the period beginning September 18, 2017 through October 30, 2017 constituted protected activity under the Act. Additionally, defendant approved plaintiff's request for intermittent FMLA leave from October 31, 2017 through September 19, 2018, and plaintiff used that leave as late as November 17, 2017.  Defendant also concedes that plaintiff suffered a materially adverse action on May 11, 2018, when it chose not to renew her contract, thereby terminating her.

---

408 F.3d 763, 771 (11th Cir. 2005) (per curiam) (internal quotation marks and citation omitted).

The Court must determine whether plaintiff can establish a causal connection between her protected activity and her termination. "A plaintiff can satisfy this burden if she can prove a 'close temporal proximity' between the time her employer learned about her protected activity and her discharge. Raspanti v. Four Amigos Travel, Inc., 266 F. App'x 820, 823 (11th Cir. 2008) (per curiam) (citation omitted). However, "[t]his standard requires that the actions be 'very close.'" Id. (citation omitted). While "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough," Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam), the Circuit has held that two months is close enough. See e.g., Robinson v. LaFarge N. Am., Inc., 240 F. App'x 824, 829 (11th Cir. 2007) (per curiam) (holding that "[plaintiff] established a prima facie case, as the demotion occurred only about two months after he filed a grievance"). Additionally, as the Circuit has explained, "[t]he causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were not wholly unrelated" and, "[g]enerally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action." Krutzig, 602 F.3d at 1234 (internal quotation marks and citation omitted).

As an initial matter, defendant's argument that plaintiff cannot meet her burden to establish a causal connection between her initial September 2017 leave request and May 2018 termination because of the eight-month time lapse is not well taken in light of the Circuit's holding in Jones.  The Circuit clarified "that temporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave."  Id. 854 F.3d at 1273.  Here, the record reflects that plaintiff used intermittent FMLA leave on November 17, 2017,[42] made a formal leave request to Ms. Young on November 30, and received Ms. Young's approval on December 5.  (Young Dep. Ex. 18 [80-19].)  That six-month period between plaintiff's last use of her leave and her termination is insufficient to infer causation; however, plaintiff has additional facts that weigh in her favor.

Notably, in a November 30, 2017 evaluation (the same day of plaintiff's intermittent FMLA leave request), Ms. Young observed that she had cautioned plaintiff about attendance.  (Young Dep. Ex. 9 [80-10], at 5.)  Additionally, in

─────────────────────

[42] Plaintiff may have used intermittent FMLA leave after November 17, 2017—the parties have not identified the last date plaintiff did so—and defendant had pre-approved such leave through September 19, 2018, well past her termination date.  Cf. Pereda, 666 F.3d at 1276 ("Under the FMLA an employee need not be currently exercising her rights . . . in order to be protected from retaliation.").

46

January or February 2018, approximately two months after the above FMLA request, the District began its contracting process for the coming school year and Ms. Young advised Human Resources that plaintiff was performing poorly, preventing her from receiving a contract renewal at that time.[43]

Ms. Young continued to rate and observe plaintiff through the remainder of the 2017-2018 school year. In the overall Summative Assessment, Ms. Young assigned plaintiff a Level II rating on Professionalism (the standard related to absenteeism). Ms. Young made the decision not to renew plaintiff guided by the ratings she assigned to plaintiff throughout the school year, which included lower ratings based on leave that Ms. Young failed to notify the District might qualify for FMLA protection and based on FMLA protected leave Ms. Young later approved. Viewing the facts in the light most favorable to plaintiff, a reasonable factfinder could conclude that plaintiff's request for and use of FMLA leave is not wholly

_____

[43] While "'every unkind act'" is not an adverse action, an objectively reasonable employee in plaintiff's position would view a supervisor's action to hold her contract renewal in abeyance as adverse and could well be dissuaded from making a charge of discrimination against that supervisor. Cf. Doe v. Dekalb Cty. Sch. Dist., 145 F.3d 1441, 1449 (11th Cir. 1998) (quoting Wu v. Thomas, 996 F.2d 271, 273 n.3 (11th Cir. 1993) (per curiam)). Thus, Ms. Young's notice to defendant to withhold plaintiff's contract at the normal renewal time constitutes a materially adverse employment action. Nevertheless, the undersigned focuses on the obvious adverse employment action—termination.

47

unrelated to Ms. Young's determination that she was not a candidate for renewal in January or February 2018, and that Ms. Young factored plaintiff's potentially qualifying leave and approved FMLA leave into the Level II rating on her Summative Assessment, resulting in her termination.

Because plaintiff can establish a prima facie case of FMLA retaliation, the burden shifts to defendant to "'articulate a legitimate, nondiscriminatory reason'" for her termination. Jones, 854 F.3d at 1271 (citation omitted). However, that "burden is merely one of production; [defendant] need not persuade the court that it was actually motivated by the proffered reasons." Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (internal quotation marks and citation omitted). Here, defendant has met its burden by citing plaintiff's consistent performance issues documented by Ms. Young and other observers over the 2017-2018 school year, and asserting that those evaluations dictated an unsatisfactory rating on plaintiff's Summative Assessment, resulting in her nonrenewal. Thus, the burden shifts back to plaintiff to show defendant's reason to be pretext for retaliation in violation of the FMLA.

To show pretext, plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not

the real reasons for the adverse employment decision." Chapman, 229 F.3d at 1024 (internal quotation marks and citation omitted).  Moreover, plaintiff may not simply quarrel with the wisdom of defendant's reasons.  Brooks v. Cty. Comm'n of Jefferson Cty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006).  Rather, plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks and citation omitted).

Here, plaintiff has produced sufficient evidence to create a genuine dispute of material fact as to whether defendant's reason for terminating her are weak and inconsistent, such that a reasonable factfinder could find them uncredible.  As discussed above, Ms. Young was plaintiff's supervisor, evaluator, and the final decision maker regarding her termination.  From beginning to end during the 2017-2018 school year, Ms. Young impeded plaintiff's receipt and use of protected leave under the FMLA.  In September 2017, Ms. Young not only failed to alert defendant that plaintiff's initial absences that year may have been due to a potentially FMLA-qualifying reason, but she chastised plaintiff despite the revelation that plaintiff had

49

sought treatment for a serious medical condition and was under a physician's continuing care.

Ms. Young critiqued plaintiff's absences even after her applications for FMLA leave, with one such admonition occurring on the same day that plaintiff applied to Ms. Young for FMLA protection of an intermittent absence.  Ms. Young knew of plaintiff's grievances against her (alleging retaliation for FMLA leave) yet continued to evaluate plaintiff, assigning her scores low enough for defendant to withhold plaintiff's contract after her mid-year evaluation and to eventually terminate her.   Moreover, despite removing a warning letter from plaintiff's personnel file, Ms. Young made no apparent adjustment to the low professionalism score that she assigned plaintiff on a November 30, 2017 evaluation based (at least in part) on absences and apparently considered that score (likely reduced by Ms. Young's own failure to comply with defendant's duties under the FMLA) in rating plaintiff a Level II on her Summative Assessment—resulting in plaintiff's termination.

Additionally, viewing the facts in a light most favorable to plaintiff, as the Court must at this stage of the litigation, many of her supervisors' critiques which resulted in lower evaluation ratings are inconsistent with their instructions to plaintiff and with her approved accommodation.  For example, Ms. Mitchell knew

50

that plaintiff was locked out of the online portal and could not submit her lesson plans electronically.  As a result, Ms. Mitchell instructed plaintiff to maintain hard copies of lesson plans in her classroom to assist any substitutes during plaintiff's absences, which plaintiff did.  Regardless of those circumstances, plaintiff was repeatedly criticized for failing to upload lesson plans online and received several Level II ratings on evaluations for failing to maintain lesson plans in accordance with school district policies and directives.  Notably, Ms. Young also found those lesson plans deficient during the 2017-2018 school year, despite finding those same plans adequate in prior years.  Plaintiff also testified that Ms. Young's instructions to her were contradicted by other administrators, resulting in plaintiff's receipt of unsatisfactory ratings despite her compliance with those new instructions.

Although defendant afforded plaintiff the accommodation of "breaks as needed" while plaintiff was experiencing a panic attack, Ms. Mitchell would insist that plaintiff notify her via email during the incident—an impossible task—and criticized plaintiff for failing to do so.  Thus, plaintiff has produced weaknesses and inconsistences sufficient for a reasonable factfinder to conclude that defendant's reasons for her termination were not the real reasons but pretext for retaliation.

Finally, even assuming plaintiff's contract abeyance mid-school year was not a materially adverse action and that she cannot show a sufficient causal connection alone between her November 2017 leave and her May 2018 termination, a reasonable fact finder could determine that plaintiff has presented a convincing mosaic of circumstances that Ms. Young retaliated against plaintiff for exercising her FMLA rights.   Accordingly, the undersigned **RECOMMENDS** that defendant's Motion be **DENIED** as to plaintiff's FMLA retaliation claim regarding her requests for and use of protected leave set forth in Count Two.

### b)   Plaintiff's Opposition Clause Claim

Because plaintiff clearly engaged in protected activity by filing multiple grievances with the District opposing Ms. Young's actions as retaliation for exercising her FMLA rights, the Court also addresses plaintiff's FMLA retaliation claim under the Act's opposition clause.

After the District rejected plaintiff's December 20 and 30, 2017 grievances as improper under the formal grievance process, Employee Relations emailed plaintiff the correct document upon which to submit her allegations of discrimination and retaliation; plaintiff completed an Employee Discrimination Complaint Form on February 2, 2018.   Among other things, plaintiff complained to the District that Ms. Young discriminated against her based on her disability,

counted FMLA protected leave against her in evaluations, and placed her on a remediation plan as retaliation for exercising her FMLA rights.  Those beliefs were subjectively and objectively reasonable given Ms. Young's failure to alert defendant after plaintiff's initial absences that she may be entitled to FMLA leave (choosing instead to chastise plaintiff), Ms. Young's notation on a November 30, 2017 evaluation cautioning plaintiff about attendance despite approval of the bulk of plaintiff's leave as protected under the FMLA, and Ms. Young's criticism of lesson plans plaintiff successfully used in the prior school year (when Ms. Young was also her evaluator).  Thus, using defendant's own process, plaintiff engaged in protected activity under the Act by opposing Ms. Young's apparent retaliation against her for exercising her rights under the FMLA.

Furthermore, plaintiff suffered materially adverse actions and submitted probative evidence establishing a causal connection between her protected activity and ultimate termination.  Sometime in January or February 2018, Ms. Young advised Human Resources that Ms. Moore was being assessed at a Level II and/or that she was on a remediation plan, effectively preventing plaintiff from receiving a contract for the next school year.  Ms. Young continued to evaluate plaintiff more harshly than the prior school year (and before her FMLA-related grievances against Ms. Young), eventually assigning plaintiff a low rating on her Summative

Assessment and thereby making the final decision to terminate plaintiff in May 2018.   Therefore, Ms. Young identified plaintiff as a candidate for nonrenewal within one month or less of plaintiff's attempted grievances against her (and possibly in the same month as plaintiff's formal grievance) and terminated plaintiff on May 11, 2018, within approximately three months of the February 2, 2018 formal grievance.   Accordingly, plaintiff has established a close connection between plaintiff's three grievances alleging FMLA discrimination by Ms. Young and two adverse actions:  (1) Ms. Young's identification of plaintiff as a candidate for nonrenewal (resulting in her contract being held) and (2) Ms. Young's ultimate decision to terminate her.

For the reasons set forth _supra_ Part III.A.2.a, defendant has proffered a legitimate non-retaliatory reason for withholding plaintiff's contract in January or February 2018 and ultimately terminating her in May.   However, as also discussed above, plaintiff has proffered sufficient evidence for a reasonable factfinder to conclude that defendant's reasons are pretextual.   Because there is a genuine dispute of material fact with respect to whether defendant's reasons for terminating plaintiff  (as dictated by Ms. Young's opinion and ratings of her) were pretext, the undersigned **RECOMMENDS** that defendant's Motion be **DENIED** as to plaintiff's FMLA opposition clause claim set forth in Count Two.

54

**B.      ADA and Rehab Act Claims**

**1.      Disability Discrimination Claim (Count Three)**

Plaintiff alleges that she is an individual with a disability as defined by the ADA and Rehab Act and that defendant discriminated against her and failed to accommodate her based on her disability by reprimanding her for necessary breaks, using covered absences as a reason to give her low evaluation scores, and ultimately declining to renew her contract.  (Compl. [1] ¶¶ 92-95.) [44]

Defendant argues that plaintiff's ADA and Rehab Act claims must fail because she has not identified any qualifying disability, defendant granted all of

---

[44] Although plaintiff states that defendant failed to accommodate her in Count Three, that claim pleads the elements of an ADA disparate treatment claim, not a failure to accommodate claim.  (See Compl. ¶¶ 89-99.)  Likewise, in their briefs, the parties only address Count Three as alleging disparate treatment.  (See generally Def. Mem.; Pl. Resp.)  Moreover, defendant provided plaintiff with the accommodation of breaks as needed and she has not alleged another specific instance in which a needed accommodation was denied; rather, her supervisors' alleged behavior more aptly fits plaintiff's claims that the District terminated her because of her disability or retaliated against her on that basis.  See Batson v. Salvation Army, 897 F.3d 1320, 1386 (11th Cir. 2018) (without specific instance in which needed accommodate was denied, plaintiff cannot establish a failure to accommodate claim); Cooper v. Walker Cty. E-911, No. 6:16-cv-1746-TMP, 2018 WL 3585217, at *12 (N.D. Ala. July 26, 2018) (defendant granted requested accommodation but later fired plaintiff, thus that allegation more appropriately addressed with regard to retaliation on basis of disability or use of FMLA leave).  Accordingly, the Court interprets Count Three as alleging an ADA disparate treatment claim.

plaintiff's requested FMLA leave, and plaintiff failed to identify a non-disabled comparator with identical performance issues who was treated preferentially. (Def. Mem. 15-17; Def. Reply 11-12.) Additionally, defendant argues that plaintiff has not identified adverse actions because she was not admonished for taking breaks, but rather asked to notify her supervisors so that her classroom was not unattended, and Ms. Young rescinded the November 16, 2017 letter of direction and did not hold plaintiff's protected absences against her in evaluations. (Def. Mem. 17-18.)

The ADA prohibits a covered employer from discriminating "against a qualified individual[45] on the basis of disability[46] in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). [47] Employees may claim unlawful

---

[45] A "qualified individual" is someone who, with or without reasonable accommodations, can perform the essential functions of the job. See Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1268 (11th Cir. 2014).

[46] The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1)(A)-(C).

[47] "The Rehabilitation Act prohibits federal agencies [and recipients of federal money] from discriminating in employment against individuals with disabilities." Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam);

discrimination under the ADA by showing either that the employer's facially neutral conduct had a disparate impact on members of a protected class (disparate impact) or that the employer treated certain employees worse than others because they possessed a protected trait (disparate treatment).  Raytheon Co. v. Hernandez, 540 U.S. 44, 52-53 (2003).  For the reasons discussed supra note 44, plaintiff has alleged a disparate treatment claim here.

"Liability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated the employer's decision.'"  Raytheon Co., 540 U.S. at 52 (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, (1993)).  Where direct evidence is not present, a circumstantial case of discrimination may be made using the burden-shifting framework outlined in McDonnell Douglas Corp.,[48] or by "'present[ing] circumstantial evidence that creates a triable issue concerning the

---

see also 29 U.S.C. § 794(a); 42 U.S.C. § 1981a(a)(2). "The standard for determining liability under the Rehabilitation Act is the same as that under the [ADA]; thus, cases involving the ADA are precedent for those involving the Rehabilitation Act." Ellis, 432 F.3d at 1326.  Accordingly, plaintiff's Rehab Act claims are treated the same as, and effectively merged with, her ADA claims.

[48] Under the McDonnell Douglas framework, a plaintiff claiming discriminatory treatment in violation of the ADA must make a prima-facie showing that (1) she is disabled as defined in the Act; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of that disability.  See Greenberg v. BellSouth Telecomms., Inc., 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam).

employer's discriminatory intent.'" Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. 2012) (quoting Smith, 644 F.3d at 1328). "A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination." Id.

As an initial matter, defendant's contention that plaintiff is not a disabled individual as defined by the ADA is without merit.[49] "The general effect of [the ADAAA] was to broaden the ADA's coverage." Moore v. Jackson Cty. Bd. of Educ., 979 F. Supp. 2d 1251, 1259-60 (N.D. Ala. 2013); see also 29 C.F.R. § 1630.1(c)(4) ("The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA."). The ADA now specifically provides that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, lifting,

---

[49] Defendant does not challenge plaintiff's status as a qualified individual under the ADA. Moreover, viewed in the light most favorable to plaintiff, there is sufficient evidence in the record to establish that she could perform the essential duties of her teaching position with or without accommodation.

bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." Id. § 12102(2)(A). "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). "[T]he threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." Id. § 1630.2(j)(1)(iii).

Viewing the facts in a light most favorable to plaintiff, she suffers from the mental ailments of anxiety, panic disorder, and attention deficit hyperactivity disorder, which cause severe chest pains, problems breathing, and blurry vision. Plaintiff takes three medications to deal with her conditions and is under the care of a physician. When plaintiff is having an episode, those symptoms substantially limit the major life activities of, inter alia, working, breathing, concentrating, communicating, and seeing. Therefore, plaintiff's episodic anxiety and panic attacks meet the expanded definition of disability.

Likewise, plaintiff was terminated—an obvious adverse action defendant fails to acknowledge with regard to plaintiff's ADA claim. Furthermore, while plaintiff concedes defendant's point that she has not identified a non-disabled comparator with identical performance issues (Pl. Resp. 24-25), "establishing the

elements of the <u>McDonnell Douglas</u> framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." <u>Smith</u>, 644 F.3d at 1328.  Rather, as the Circuit has explained, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" <u>Id.</u>  "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."   <u>Id.</u> (internal quotation marks, footnote, and citation omitted).

Here, for the reasons set forth <u>supra</u> Part III.A.2.a, plaintiff has presented circumstantial evidence that creates a triable issue as to whether her disability motivated defendant's final decision to terminate her.  It is undisputed that Ms. Young was the decision maker here and, viewing the facts in a light most favorable to plaintiff, a jury could infer that she intentionally discriminated against plaintiff based on her reactions to plaintiff's disability-related absences and need for accommodations (i.e., leave and breaks as need) and reduced plaintiff's periodic

and final assessment ratings on that basis, resulting in plaintiff's termination.[50] Accordingly, the undersigned **RECOMMENDS** that defendant's Motion be **DENIED** as to plaintiff's ADA and Rehab Act disability discrimination claims set forth in Count Three.

## 2.    Retaliation for Protected Activity (Count Four)

Plaintiff alleges that defendant discriminated against her in retaliation for engaging in protected activity (i.e., complaining about discrimination internally and filing an EEOC Charge[51]) by using absences against her, giving her low evaluation scores, placing her on a remediation plan, and ultimately declining to renew her contract, i.e., terminating her.  (Compl. [1] ¶¶ 103-04.)

Defendant argues that plaintiff's ADA retaliation claim should be rejected based on the same arguments set forth in its opposition to her FMLA retaliation claim.   (Def. Mem. 20; Def. Reply 12.)    Additionally, defendant argues that

―――――――――――――――

[50] The Court notes that Ms. Young testified that the cumulative ratings on plaintiff's various assessments throughout the school year dictated the termination decision; however, Ms. Young was plaintiff's ultimate evaluator.  (See Young Dep. [80] 43-53.)

[51] For the reasons set forth supra note 40, plaintiff has proffered no evidence that defendant or Ms. Young (the undisputed decision maker) knew of that Charge when it terminated her.  Accordingly, the undersigned **REPORTS** that plaintiff has not stated a participation clause claim under the ADA.

plaintiff's claim that it retaliated against her by rejecting her Level I grievance and Level II appeal must fail because both requests were rejected simply because District policy does not provide for formal review of evaluation scores. (Def. Mem. 20; Def. Reply 12-13.)  Given that policy, defendant asserts that its rejection of plaintiff's requests could have no relation to any protected activity and that pretext in the face of such a policy is impossible to prove.  (Def. Mem. 20-21.)

As the parties acknowledge in their briefs, retaliation claims are cognizable under both the ADA and the FMLA and the analysis of plaintiff's retaliation claims under both Acts is the same.  See Batson, 897 F.3d at 1327 (addressing FMLA and ADA retaliation claims together because they "require similar legal analysis and depend upon the same set of facts"); see also Perrymond v. Lockheed Martin Corp., No. 1:09-CV-1936-TWT, 2010 WL 987218, at *9 n.10 (N.D. Ga. Feb. 3, 2010 (holding that "Plaintiff's objections to discriminatory practices related to FMLA benefits . . . would raise an opposition clause claim" under the ADA).

Here, plaintiff engaged in the ADA protected activities of requesting and taking medical leave due to her disability and opposing what she reasonably believed were Ms. Young's discriminatory actions for that behavior via her February 2, 2018 formal complaint.  See 42 U.S.C. § 12203(a) (prohibiting retaliation against employee who has "opposed any act or practice made unlawful

62

by" the ADA); Vaughan v. World Changers Church Int'l, Inc., 1:13-CV-0746-AT, 2014 WL 4978439, at *12 & n.10 (N.D. Ga. Sept. 16, 2014) (request for medical leave considered statutorily protected activity for purposes of ADA retaliation claim); Hein v. IMS Gear Holding, Inc., 2:16-CV-00081-RWS-JCF, 2018 WL 1833254, at *24 (N.D. Ga. Jan. 31, 2018) (protected activity and analysis of FMLA and ADA retaliation claims the same and collecting cases).  Thus, for the reasons set forth supra Parts III.A.2.a-b, a reasonable fact finder could find a causal connection or a convincing mosaic of circumstances between plaintiff's protected activities under the ADA and her contract abeyance mid-school year, followed by her termination in May 2018.  Accordingly, the undersigned **RECOMMENDS** that defendant's Motion be **DENIED** as to plaintiff's ADA and Rehab Act retaliation claims set forth in Count Four.

### C.    Title VII and Related § 1981 Claims (Count Five) [52]

Plaintiff alleges that defendant retaliated against her for complaining of, and objecting to, race discrimination and requesting staff ethnicity training by giving

---

[52] Defendant notes that plaintiff uses the term "hostile work environment in Counts V and VI, but fails to bring a separate claim for retaliatory hostile work environment.  (Def. Mem. 24-25 n.3.)  In an abundance of caution, defendant argues in a footnote that any such claim would fail for the reasons set forth above and because plaintiff failed to establish severe and pervasive retaliation relating to

her low evaluation scores, placing her on a remediation plan, subjecting her to a hostile work environment, and ultimately declining to renew her contract.   (Compl. [1] ¶¶ 110-11.)

Defendant argues that plaintiff's complaint about the treatment of African-American students does not constitute opposition to an unlawful employment practice by the District against its employees and therefore cannot be protected activity.  (Def. Mem. 22-23.)  Even assuming that plaintiff engaged in protected activity, defendant argues that she cannot establish a causal relationship between the alleged adverse actions during the 2017-2018 school year and her complaints at the end of the 2016-2017 school year.  (Id. at 23.)  In support of this argument, defendant points to the "substantial delay" between the alleged protected activity and the alleged adverse actions, including a seven-month delay between her complaints and the December 2017 remediation plan and a one-year delay between her complaints and nonrenewal.  (Id. at 23-24.)  Finally, defendant again relies on

_____

her complaints or that any retaliation was the but-for cause of a hostile work environment.  (Id.)  Plaintiff failed to clarify the matter in her response or address defendant's arguments in that regard.  (See generally Pl. Resp.)  Accordingly, any such claim has been abandoned.  See Bute v. Schuller Int'l, Inc., 998 F. Supp. 1473, 1477 (N.D. Ga. 1998).

plaintiff's documented performance issues as legitimate, non-retaliatory reasons for the alleged adverse actions.  (Id. at 24.)

"Both Title VII and § 1981 prohibit employers from retaliating against a person because she has opposed any practice prohibited by Title VII or made a charge of discrimination."  Wells v. Gen. Dynamics Info. Tech. Inc., 571 F. App'x 732, 736 (11th Cir. 2014) (per curiam).  Title VII prohibits employers from discriminating against prospective or current employees with respect to compensation, terms, conditions, or privileges of employment because of their employee's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  Likewise, the Act prohibits as an "unlawful employment practice" an employer's discrimination against any of its employees "because he has opposed any practice made an unlawful employment practice by [the Act]."  Id. § 2000e-3(a).[53]  Similarly, § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," id. § 1981(a), and prohibits an employer from taking

---

[53] The Court does not address Title VII's participation clause (or a similar claim under § 1981) because, for the reasons set forth supra note 40, plaintiff has not proffered any evidence that defendant or Ms. Young knew of her EEOC Charge before making the decision to terminate her.

65

adverse action against an employee who has opposed the impairment of their contractual relationship on discriminatory grounds, Locascio v. BBDO Atlanta, Inc., 56 F. Supp. 3d 1356, 1363 (N.D. Ga. 2014).

Employment-related retaliation claims brought pursuant to § 1981 are analyzed using the same framework as Title VII retaliation claims. Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1277 (11th Cir. 2008). Additionally, as discussed supra Part III.A.2, the McDonnell Douglas framework applies to plaintiff's claims of retaliation in violation of Title VII and § 1981. Therefore, to establish a prima facia case of retaliation under both statutes, plaintiff must show that: (1) she engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal connection between the two. See Stinson v. Pub. Serv. Tel. Co., 486 F. App'x 8, 10-11 (11th Cir. 2012) (per curiam) (applying McDonnell Douglas framework to Title VII and § 1981 retaliation claims).

With regard to the first element, plaintiff must show that she objectively believed that defendant was engaged in unlawful employment practices, as measured against existing law. See Clover, 176 F.3d at 1351; Little, 103 F.3d at 960. However, viewing the facts in the light most favorable to plaintiff, her complaints regarding the treatment of students, her requests for staff ethnicity training on that basis, and her February 2, 2018 formal complaint (reiterating her

66

allegations of teacher-on-student discrimination based on race) do not constitute protected conduct under Title VII and § 1981.  Those complaints do not support an objective belief that defendant engaged in an unlawful <u>employment</u> practice or interfered with plaintiff's teaching contract on the basis of race.  Nor did defendant require plaintiff to discipline those students or force her to engage in discriminatory behavior as part of her contractual duties.

Notably, the facts here are different from those in <u>Phillips v. Hood River School District</u>, No. CV 98-1161-AS, 1999 WL 562682 (D. Ore. Apr. 22, 1999), which plaintiff cites in support of her claim.  In <u>Phillips</u>, the district court denied the defendant's motion to dismiss the plaintiff's claim that she was terminated in retaliation for reporting a sexually hostile work environment.  <u>Id.</u>  The hostile work environment was not created by other teachers at the school where the plaintiff worked, but by a trio of male students who routinely harassed a female student with offensive words and touching and who were not disciplined by the principal despite the plaintiff's complaints.  <u>Id.</u>  Thus, the district court found that the plaintiff had a reasonable belief that that the defendant was engaged in an unlawful employment practice—refusing to remedy a sexually hostile work environment.  <u>Id.</u>

Here, plaintiff's request for ethnicity training for the School's staff does not constitute opposition to an unlawful employment practice under the circumstances.

In her February 2, 2018 formal complaint, plaintiff reported four independent incidents—three in the 2016-2017 school year and one in the 2017-2018 school year.   Three alleged incidents of unwarranted discipline of African-American students by Caucasian teachers in the hallway (two in the 2016-2017 school year and one in the 2017-2018 school year) do not create a serious and pervasive racially hostile work environment.   See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (Title VII hostile work environment claim requires proof that workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment).   Moreover, defendant disciplined the teacher who used racially-charged language and made clearly egregious statements toward an African-American student.  (See Young Dep. [80] 29-30.)  Plaintiff simply has not proffered facts sufficient to support an objective belief that the District and Ms. Young (the School's African-American principal) refused to remedy a severe and pervasive racially hostile environment at the School.  See Clover, 176 F.3d at 1350-51 (plaintiff's statements were not protected conduct under Title VII's opposition clause because plaintiff's belief that the behavior of another employee toward a high school student created a sexually hostile environment was not objectively reasonable).   Because plaintiff's belief that she was opposing racially

68

discriminatory conduct which violated Title VII and § 1981 was not objectively reasonable, she cannot establish that she engaged in protected conduct as required to show the first element of a prima facie case of retaliation under Title VII and § 1981.  Accordingly, the undersigned **RECOMMENDS** that defendant's Motion be **GRANTED** as to plaintiff's Title VII and § 1981 retaliation claims alleged in Count Five.

**D.    Title VI and Related § 1981 Claims (Count Six)**

Plaintiff alleges that defendant retaliated against her for complaining of race discrimination on behalf of African-American students by giving her low evaluation scores, placing her on a remediation plan, subjecting her to a hostile work environment, and ultimately declining to renew her contract.  (Compl. [1] ¶¶ 120-21.)

Defendant does not cite cases specifically addressing Title VI, but relies on the same arguments set forth <u>supra</u> Part III.C in support of its request for summary judgment as to Count Six.  (Def. Mem. 21-24.)  Assuming that plaintiff engaged in protected activity, defendant argues that she cannot establish a causal relationship between her complaints regarding the treatment of students and the alleged adverse actions in the following school year or her nonrenewal.  (<u>Id.</u> at 23-24.)  Defendant

69

cites plaintiff's performance issues as legitimate, non-retaliatory reasons for its actions and her termination.  (Id. at 24.)

Title VI prohibits discrimination on the basis of race in programs receiving federal financial assistance.  42 U.S.C. § 2000d.  Title VI's prohibition on racial discrimination includes a prohibition against retaliation for complaining of the same.  See Bowers v. Bd. of Regents of Univ. Sys. of Ga., 509 F. App'x 906, 911 n.8 (11th Cir.2013) (per curiam) (recognizing Title VI retaliation claim); McCullough v. Bd. of Regents of Univ. Sys. of Ga., No. 1:13-CV-118 (WLS), 2014 WL 4924497, at *2 (M.D. Ga. Sept. 30, 2014) (collecting cases recognizing the same).[54]

Because plaintiff bases both of these retaliation claims on circumstantial evidence, the Court applies the same McDonnell Douglas framework applied to other retaliation claims.  See Bowers, 509 F. App'x at 911-12 (applying McDonnell

_____

[54] Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a); see also CBOCS W., Inc. v. Humphries, 553 U.S. 442, 445, 457 (2008) (§ 1981 encompasses retaliation claim by person who has complained about a violation of another person's contract-related "right.").  Here, plaintiff has not alleged what contract right the students had that defendant allegedly retaliated against her for protecting.  Regardless, the analysis set forth infra would apply to any such retaliation claim; thus a claim under § 1981 would also fail as a matter of law under the circumstances.

<u>Douglas</u> framework to Title VI retaliation claim); <u>see also</u> <u>McCullough</u>, 2014 WL 4924497, at *2 (same);  <u>Chaney v. Taylor Cty. Sch. Dist.</u>, No. 4:11-CV-142 (CDL), 2014 WL 28815, at *1-2 (M.D. Ga. Jan. 2, 2014) (same).  Therefore, to establish a prima facia case of retaliation under Title VI, plaintiff must show that:  (1) she engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal connection between the two.  <u>See</u> <u>Bowers</u>, 509 F. App'x at 911-12.  Likewise, as discussed <u>supra</u> Part III.C, plaintiff's belief that she was opposing racial discrimination on behalf of the students must be objectively reasonable.  <u>See</u> <u>Chaney</u>, 2014 WL 28815, at *2.

With regard to plaintiff's complaints directly to Ms. Young concerning the treatment of African-American students, her last complaint occurred on August 3, 2017.  Assuming without finding that last direct complaint (and her complaints during the 2016-2017 school year) constituted protected conduct under Title VI, plaintiff cannot establish a causal connection between that conduct and defendant's adverse actions.   At minimum, approximately five months elapsed between plaintiff's race-related complaint to Ms. Young and defendant's first materially adverse employment action against her—its January or February 2018 decision to hold plaintiff's contract renewal.  The case law is clear that, without more, such a lapse in time simply is insufficient to establish a causal connection.  Moreover,

unlike plaintiff's FMLA and ADA claims, where her supervisors repeatedly raised plaintiff's absences and breaks in their interactions with and evaluations of her throughout the 2017-2018 school year, there are no facts supporting any additional references or actions related to race in the record after plaintiff's August 3, 2017 complaint, until she attempted to formally complain to the District in late December 2017.  Thus, plaintiff cannot establish a causal connection between her complaints directly to Ms. Young regarding the treatment of African-American students and defendant's adverse employment actions.

With regard to plaintiff's February 2, 2018 formal complaint to the District, the circumstantial evidence and undisputed facts surrounding the incidents she raised in that complaint do not support an objectively reasonably belief that defendant engaged or permitted race-based discrimination toward students.  There is no evidence that the two incidents of Caucasian teachers chastising an African-American student in the hallway during the 2016-2017 school year involved race-based discrimination.  Plaintiff has not proffered any evidence outside of her subjective impression of the situations that the discipline was unwarranted or that it was formalized.  With regard to the clearly racist remark made by a Caucasian teacher, the District punished her—therefore, defendant did not act unlawfully, but properly addressed hurtful, racially discriminatory statements by a teacher toward

72

a student.  Finally, as with the first two incidents, the situation involving plaintiff's students at the beginning of the 2017-2018 school year also is not imbued with race-based animus.  Rather, the email chain reflects Ms. Gwyn's frustration with plaintiff's judgment regarding the use of students to run personal errands.  Only plaintiff raised race as an issue, and only after the event has passed, while later speaking with Ms. Young.  There is no evidence that race was a factor in the conversation between Ms. Gwyn and the students or between Ms. Gwyn and plaintiff in their email exchange.  Because plaintiff's belief that she was opposing racially discriminatory conduct toward students which violated Title VI and § 1981 was not objectively reasonable, she cannot establish that her February 2, 2018 formal complaint constituted protected activity under those statutes.

Therefore, for the reasons set forth above, plaintiff cannot establish a prima facia case of retaliation in violation of Title VI and § 1981.  Nor is there a convincing mosaic of circumstantial evidence that would allow a jury to infer that defendant retaliated against plaintiff based on her race-related complaints.  Accordingly, the undersigned **RECOMMENDS** that defendant's Motion be **GRANTED** as to plaintiff's Title VI and § 1981 retaliation claims alleged in Count Six.

## IV.  <u>CONCLUSION</u>

For the reasons explained above, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [58] be **DENIED IN PART** and **GRANTED IN PART**.  Summary judgment should be **GRANTED** in defendant's favor as to Counts Five and Six and plaintiff's remaining claims in Counts One through Four should be permitted to proceed to trial.

The Clerk is **DIRECTED** to terminate the reference to the undersigned Magistrate Judge.

**SO RECOMMENDED**, this 2nd day of June, 2021.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

74