## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Ellena Moore,

                    Plaintiff,

                              Case No. 1:19-cv-4174-MLB

v.

Cobb County School District,

                    Defendant.

_____/

## **OPINION & ORDER**

Plaintiff Ellena Moore alleges her former employer, Defendant Cobb County School District, interfered with her ability to take medical leave and retaliated against her for doing so in violation of the Family and Medical Leave Act ("FMLA"), discriminated against her based on her disabilities and retaliated against her for engaging in protected activity in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act, retaliated against her for engaging in protected activity in violation of Title VII of the Civil Rights Act and 42 U.S.C. § 1981, and retaliated against her for complaining about the discrimination in violation of Title VI of the Civil Rights Act and 42

U.S.C. § 1981.  (Dkt. 1.)  Defendant moved for summary judgment.  (Dkt. 58.)  The Magistrate Judge issued a Report and Recommendation ("R&R"), recommending Defendant's motion be granted in part and denied in part.  (Dkt. 84.)  Plaintiff objects to the Magistrate Judge's recommendation.  (Dkt. 86.)  After conducting a de novo review of the portions of the R&R to which Plaintiff specifically objects, the Court sustains in part and overrules in part Plaintiff's objections.

## I.   Background[1]

Defendant operates more than 144 schools and employs over 13,000 people.  (Dkt. 84 at 3.)  Defendant employed Plaintiff, an African American, as a teacher at East Cobb Middle School ("School") for the 2015–16, 2016–17,[2] and 2017–18 school years.  (*Id.*)  Defendant also employed Leetonia Young, an African American, as the principal of the School.  (*Id.* at 4.)

---

[1] The Magistrate Judge thoroughly laid out the factual background in his R&R.  (Dkt. 84 at 2–30.)  With two exceptions (*see infra* note 8 and Section III.A), the Court finds no plain error in the Magistrate Judge's application of Local Rule 56.1(B) and adopts the facts as laid out in the R&R.  For convenience, the Court summarizes the facts here.

[2] Plaintiff also served as the math department chair for the School and the PLC lead for the math teacher in her grade level.  (Dkt. 84 at 3 n.2.)

## A.     Defendant's System for Evaluating Teachers

To ensure consistency and comparability for evaluating teachers across the state, the Georgia Department of Education ("GADOE") implemented a common evaluation system for all teachers called the Teacher Keys Effectiveness System ("TKES").  (*Id.*)  TKES has multiple components that contribute to a teacher's overall evaluation.  (*Id.* at 5.) One is the Teacher Assessment on Performance Standards, which provides evaluators with a qualitative, rubrics-based evaluation method by which they can measure teacher performance related to quality performance standards.  (*Id.*)  There are ten performance standards: professional knowledge, instructional planning, instructional strategies, differentiated instruction, assessment strategies, assessment uses, positive learning environment, academically challenging environment, professionalism, and communication.  (*Id.*)  Teachers are responsible for submitting documentation, including lesson plans, as requested by the evaluator.  (*Id.* at 5–6.)  When conducting an end of the year Summative Assessment on each of the performance standards, the evaluator is directed to determine where "the totality of the evidence and most consistent practice" exists for the entire evaluation period, not just a

particular lesson or snapshot in time. (*Id.* at 6.) The Summative Assessment takes into consideration all previous evaluations. (*Id.* at 7.) If a teacher earns an overall rating of Level I or II on his or her Summative Assessment, Defendant may not offer that teacher a contract for the following school year.[3] (*Id.*)

## B.   Absences During the 2016–17 School Year

On March 24, 2017, the School's assistant principal, Ms. Mitchell, issued a letter of direction to Plaintiff about excess absenteeism for the 2016–17 school year. (*Id.*) The letter's introductory paragraph states:

> As we discussed during the conference, you had taken a total of 9.25 days of short[-]term leave since July 25, 2016. As of March 21, 2017, you are at or nearing the level of absenteeism that is considered unacceptable, in that it poses an undue hardship on your coworkers and the entire department. The instruction you provide to students is critical to student achievement, and prompt and regular attendance is part of the essential functions of your job duties.

(*Id.* at 8.) The letter also states that absences in excess of 6.5 days within a fiscal year for 180–89 day employees, 7 for 190–94 day employees, 8 for 210–39 day employees, and 9 for 240–60 day employees "may result in corrective action consistent with progressive discipline." (*Id.*) The letter

---

[3] The GADOE defines a Level I or II rating as "not proficient." (Dkt. 84 at 7.)

instructs Plaintiff to improve her attendance and warns that failure to do so and/or any other misconduct may lead to further disciplinary action, up to and including termination. (*Id.*) Plaintiff does not recall receiving this letter, but she did talk to Ms. Mitchell about her absences during the 2016–17 school year. (*Id.*) According to Plaintiff, when Ms. Mitchell asked about her absences, Plaintiff told her the reasons for most of them, and Ms. Mitchell replied, "That was fine and that was just a formality and that was the end of it." (*Id.*)

### C.   Complaints About Student Treatment

#### 1.   2016–17 School Year

At the end of the 2016–17 school year, Plaintiff complained to Ms. Young about the treatment of three African American students at the School. (*Id.* at 9.) Two of the incidents involved three Caucasian teachers surrounding and scolding an African American student in the hallway. (*Id.*) The third involved a Caucasian teacher telling an African American student something to the effect of: "This is why y'all are getting shot by the police now, because you don't know how to do something the first time you are asked." (*Id.*) As part of this conversation, Plaintiff asked Ms. Young if the school staff could participate in ethnicity training for the

next school year. (*Id.*) Plaintiff also asked the School's assistant principal, Ms. Gary-Robinson, for her support in getting ethnicity training. (*Id.* at 10.) Ms. Gary-Robinson, an African American, said she would talk to Ms. Young about it. (*Id.*)

### 2. August 2017 Complaint

In early August of the 2017–18 school year, Plaintiff asked two of her students, who were African American, to return a cup to another teacher. (*Id.*) The School's assistant principal, April Gwyn, returned the students to Plaintiff and gave her the impression the students had been disruptive. (*Id.* at 11.) Plaintiff and Ms. Gwyn, a Caucasian, emailed each other several times about the incident, and Plaintiff objected to Ms. Gwyn's characterization of the students' behavior. (*Id.*) Ms. Gwyn took issue with Plaintiff's use of students to perform personal errands, citing multiple incidents of the same during the first week of school. (*Id.*) Ms. Young was copied during the email exchange. (*Id.*) Ms. Young later told them the conversation was over, to stop emailing back and forth about the issue, and to speak in person, if necessary. (*Id.*) The students' race was not mentioned in the emails. (*Id.*)

6

### D.    Absences During the 2017–18 School Year

At the beginning of the 2017–18 school year, Plaintiff took sick leave on August 3, 24, and 25 and unpaid leave on August 25, 28, and 29.[4] (*Id.* at 12.)  On August 31, 2017, Plaintiff emailed Ms. Young and Ms. Mitchell, explaining that she missed four days of work the week before because she was "feeling ill" but had visited her doctor and received a diagnosis. (*Id.*)  Plaintiff stated she did not want to reveal her diagnosis at that time but explained "it is of a serious nature" and she "was immediately placed on a medical treatment plan and prescribed medication" that she was "currently taking." (*Id.*)  Plaintiff again took unpaid leave on September 1, 5, and 15, 2017. (*Id.*)  On September 5, 2017, Ms. Young sent Plaintiff an email about her absences:

> Ms. Moore, I am available to meet with you on Thursday September 7th at 10:00AM.  In addition to what you would like to speak with me about[,] we also need to discuss your absenteeism.  Maybe that is what you would like to discuss as well.  As of today 9/5/17 you have already taken a total of 6+ days of short[-]term leave[,] which according to the Cobb County School District is the level of absenteeism that is considered excessive and unacceptable for [an] 190 day employee[] and warrants a letter of concern on the seventh day of absence.  Short-term leave is available to take when you or your immediate family is ill.  We all fall ill sometimes.

---

[4] On August 25, Plaintiff took 6 hours of sick leave and 1.5 hours of unpaid leave. (Dkt. 84 at 12 n.12.)

It is important that you provide notices for [sic] documentation whenever you are absent from work. I look forward to speaking with you on Thursday[,] and I wish you well.

(*Id*. at 12–13.) Plaintiff eventually told Ms. Young that she had been diagnosed with anxiety, panic disorder, and attention deficit hyperactivity disorder. (*Id*. at 13.) She takes three medications for her disorders. (*Id*.) She also told Ms. Young about her symptoms (i.e., severe chest pains, problems breathing, and blurry vision). (*Id*.)

On September 19, 2017, Plaintiff requested, and Defendant later approved, FMLA leave from September 18 through October 30. (*Id*.) On November 16, 2017, Ms. Young sent Plaintiff an email about her absences:

This email is to serve as documentation noting the number of days, outside of your FMLA, that you have been absent from work this contract year for the 2017–2018. Please note that you have taken a total of **Approx. 8.25 sick leave** days, as of November 14, 2017[,] which has reached the level of absenteeism that is considered excessive and unacceptable in the Cobb County School District.

Just a reminder that according to CCSD (Rule GCQF). "Absences in excess of 6.5 days for 190[-]day employees may result in corrective action consistent with progressive discipline."

Also know that it is good practice[] to provide medical documentation to your supervisor upon your return to work.

8

> At this time, a letter of concern for absences will be placed in your file. Please meet with me tomorrow at 10:00AM to receive a copy and to discuss the letter.

(*Id.* at 14.) On November 30, 2017, Plaintiff notified Ms. Young that she was seeking FMLA leave for her November 17th absence, and Ms. Young approved that request on December 5, 2017. (*Id.*) On December 6, 2017, Defendant approved Plaintiff for intermittent FMLA leave from October 31, 2017 through September 19, 2018.[5] (*Id.* at 15.) After Ms. Young learned Plaintiff's request for intermittent FMLA leave had been granted, she removed the November 16, 2017 email from Plaintiff's file. (*Id.*)

### E.    Accommodations During the 2017–18 School Year

Defendant allowed Plaintiff to take "breaks as needed." (*Id.* at 16.) Ms. Mitchell asked Plaintiff to let her or Ms. Young know when she was having an episode. (*Id.*) But that would require Plaintiff to send an email to them at a time when she was physically unable to do so, and so she would tell Ms. Mitchell or Ms. Young after an episode. (*Id.*) Plaintiff

---

[5] The intermittent leave retroactively began when Plaintiff's original leave ended. (Dkt. 84 at 15.) Plaintiff testified, however, that she was instructed to change her intermittent FMLA leave paperwork to remove the request for FMLA protection for the August and September dates. (*Id.*)

denies receiving an accommodation because taking breaks came with consequences.  (*Id.* at 17.)  For example, Ms. Mitchell would see Plaintiff sitting somewhere while she was having a panic attack and email Plaintiff stating she was not at a certain place or doing a certain thing. (*Id.*)

Ms. Young testified by declaration that "there was a concern for both student safety . . . and for providing adequate instruction for [Plaintiff's] unsupervised students" when Plaintiff left her classroom. (*Id.* at 16.)  Plaintiff, however, testified by declaration that she did not leave her students unattended when she experienced an episode.  (*Id.* at 16–17.)  She said she rarely had an episode while teaching, but it did occur a few times after she met with administrators and returned directly to class or was being observed by administrators while teaching.[6]  (*Id.* at 17.)  If Plaintiff thought she was going to have an episode, she would tell her students to start their independent work and knock on the door of the teacher across the hall to ask her to watch her classroom until Plaintiff returned.  (*Id.*)

---

[6] Ms. Mitchell and Ms. Young caused Plaintiff great "anxiety."  (Dkt. 84 at 17.)

Additionally, Ms. Mitchell reported consistently having trouble locating lesson plans for Plaintiff's substitute teachers.   (*Id.* at 18.) Plaintiff informed Ms. Mitchell that she was locked out of the online portal and could not electronically submit her lesson plans. (*Id.*)  Ms. Mitchell thus instructed Plaintiff to email the technology person and keep a hard copy of her lesson plans. (*Id.*)  Plaintiff testified that she left her lesson plans in a binder in her classroom. (*Id.*)

### F.    2017–18 School Year Performance Evaluations

During the 2017–18 school year, Plaintiff taught remedial math. (*Id.* at 19.)  She also taught that course in the 2016–17 school year.  (*Id.*) She used the same lesson plans for both years.  (*Id.*)  At the end of the 2016–17 school year, Plaintiff received a Summative Assessment score of 25 and a Level III rating.  (*Id.*)  For the 2017–18 school year, Plaintiff, unlike in past years, did not choose the dates she would be observed and was not notified of what and how many standards the observers would be using.  (*Id.*)  She received multiple formal and informal performance evaluations from Ms. Young, Ms. Mitchell, Ms. Gary-Robinson, and Ms. Gwyn, including, but not limited to, the following:

- On or about November 30, 2017, Plaintiff was observed, evaluated, and assigned five Level II ratings in the

11

standards of instructional planning, differentiated instruction, assessment uses, professionalism, and communication. Her professionalism rating had the following comment (among others): "Ms. Moore has also been cautioned about her attendance."

- On or about December 20, 2017, Plaintiff was observed, evaluated, and assigned four Level II ratings in instructional planning, differentiated instruction, assessment uses, and professionalism.
- On or about January 26, 2018, Plaintiff was observed, evaluated, and assigned a Level II rating in instructional planning. The comment section noted that she failed to perform her essential duty of maintaining lesson plans in accordance with Defendant's policies and directives.

(*Id.* at 19–20.) For her mid-year evaluation, Plaintiff received a Level II rating and a score of 15 out of a possible 30 points. (*Id.* at 20.) Following that evaluation, Ms. Young placed Plaintiff on a remediation plan. (*Id.* at 21.) Ms. Young believed Plaintiff was struggling in her performance at the beginning of 2017 and wanted to help Plaintiff by placing her on a remediation plan, which included weekly feedback and classroom walk-throughs. (*Id.*) Plaintiff, however, testified that when she returned from leave "it was pretty clear they didn't want [her] there and they used [her] remediation plan to get [her] out of school." (*Id.* at 21–22.) According to Plaintiff, Ms. Young would request things from her in

12

the remediation plan, and even when Plaintiff met them, Ms. Young

was never satisfied.  (*Id.* at 22.)  For example, Plaintiff explained:

> Even when I did exactly how she said do it, and then she
> would have me go meet with another administrator and they
> would tell me to do it a different way and I would do it that
> way and it was still [un]satisfactory.  I was meeting with a
> math coach once a week doing things the way she said do them
> and it was still unsatisfactory.

(*Id.*)  Plaintiff believed that no matter what she did on the

remediation plan, she would not succeed.  (*Id.*)

On January 31, 2018, Ms. Gary-Robinson observed Plaintiff

in class and took notes, which she then provided to Ms. Young.  (*Id.*)

In the notes, Ms. Gary-Robinson wrote nothing negative.[7]  (*Id.*)  Ms.

Gary-Robinson testified that she does not recall giving Plaintiff any

ratings because of the observation or entering it into the TKES

platform and did not believe that the observation went into the

platform.  (*Id.* at 23.)

---

[7] She included comments such as "Students are working in collaborative
groups on workbook assignments.  As [Plaintiff] is walking and
answering question[s,] a student asked about a problem she was solving";
"[i]nstructional plans reflect exactly what was done in class today";
"[Plaintiff] summarized the lesson by asking the students about the
lesson and the activity"; "[g]roups had roles"; and "[s]tudents are
comfortable in class and openly share."  (Dkt. 84 at 22.)

### G.    2017 Grievances and 2018 Formal Complaint

On December 20, 2017, Plaintiff filed a certified employee grievance form – Level I.  (*Id.*)  Plaintiff alleged that Ms. Young retaliated against her and harassed her for exercising her rights under the FMLA by issuing Plaintiff a letter of direction about her attendance, giving her lower ratings on her mid-year evaluation, and increasing the number of times Plaintiff was observed during the school year.  (*Id.*)  On December 21, 2017, Defendant denied Plaintiff's grievance because it concerned matters excluded from the formal grievance process, such as "performance evaluations, performance ratings, job performance issues, and the reprimand of any employee."  (*Id.* at 24.)

On December 30, 2017, Plaintiff filed a Level II appeal to Dr. Robert Downs, who denied it on the same grounds but informed Plaintiff that Defendant had a separate process for filing a complaint about discretionary acts, including retaliation.  (*Id.*)  On January 16, 2018, Defendant's Employee Relations emailed information and forms for filing a discrimination complaint to Plaintiff.  (*Id.*)  On February 2, 2018, Plaintiff completed an "Employee Discrimination Complaint Form," alleging that Ms. Young (1) discriminated against her based on race,

14

disability, and the need for medical leave and (2) engaged in retaliation by, among other things, placing her on a remediation plan and an increased observation schedule. (*Id.*) Plaintiff also alleged she was retaliated against for requesting ethnicity training, complaining about several incidents of discriminatory treatment of African American students, and exercising her rights under the FMLA. (*Id.* at 25.) Robert Rynearson, an employee with Defendant's Human Resources Department ("HR"), investigated Plaintiff's allegations. (*Id.* at 26.) In connection with that investigation, Mr. Rynearson interviewed Plaintiff, Ms. Mitchell, and Ms. Young. (*Id.*) On March 6, 2018, HR issued a report finding that Plaintiff's complaint was not substantiated by the investigation. (*Id.* at 27.)

## H.    2018 Summative Assessment and Non-Renewal

Each year, Defendant begins the contract renewal process in January or February by asking principals for the names of teachers who have scored less than a 17 and the names of teachers who are on remediation plans because their scores from the year before were a Level I or II. (*Id.*) During the 2017–18 school year, when it was time for contracts to go out, Ms. Young advised HR that Plaintiff was at a Level

II and/or she was on a remediation plan.  (*Id.*)  According to Ms. Young, if a teacher is given a Level I or II for the Summative Assessment, he or she may not be offered a contract.  (*Id.* at 28.)

On April 19, 2018, Ms. Young rated Plaintiff on all ten performance standards for her Summative Assessment, with an overall rating of Level II (five standards rated Level II and five standards rated Level III).  (*Id.*) On professionalism, Ms. Young rated Plaintiff as a Level II and commented that she was "inconsistent with some duties and responsibilities, local procedures and protocols."  (*Id.*)  Defendant contends Ms. Young made the final decision not to renew Plaintiff's contract using Defendant's evaluation process.[8]  (*Id.*)  She was guided by the ratings assigned to Plaintiff throughout the school year, her overall knowledge of Plaintiff's performance, and Plaintiff's Level II rating on the mid-year formative evaluation and the final Summative Assessment. (*Id.* at 28–29.)  On May 11, 2018, Defendant notified Plaintiff that it

---

[8] The Court adds the caveat of "Defendant contends" because, although Defendant identifies Ms. Young as the decisionmaker in its interrogatory responses, Ms. Young testified to the contrary. (*See, e.g.*, Dkt. 80 at 38:9–39:21, 41:11–12 ("Again, the district does the nonrenewal."), 43:7–10 ("So again, at the end of the evaluation process, when a teacher is not proficient — they're not at a Level 3, then the district will make that recommendation for nonrenewal.").)

would not renew her teaching contract for the 2018–19 school year.  (*Id.* at 29.)

## I.   EEOC Charge

On May 7, 2018, Plaintiff filed a charge of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC").  (*Id.*)  Plaintiff asserted that she was being retaliated against because of her disability and for complaining about the discriminatory treatment of African American students and exercising her rights under the FMLA.  (*Id.*)  Plaintiff explained that Ms. Young gave her a Level II score on her Summative Assessment, which would be classified as unsatisfactory by Defendant and likely result in a loss of a step increase in pay.  (*Id.*)  She also alleged that the retaliation and discrimination was a "continuing action."  (*Id.*)  The EEOC mailed a notice of right to sue on June 17, 2019.  (*Id.*)  Plaintiff received the notice on June 26, 2019 and filed this lawsuit on September 16, 2019.  (*Id.* at 29–30.)

## II.   Standard of Review

The district court must "conduct[] a plain error review of the portions of the R&R to which neither party offers specific objections and a de novo review of the Magistrate Judge's findings to which [a party]

17

specifically objects." *United States v. McIntosh*, No. 1:18-cr-00431, 2019 WL 7184540, at *3 (N.D. Ga. Dec. 26, 2019); *accord* 28 U.S.C. § 636(b)(1) ("[T]he court shall make a de novo determination of those portions of the [R&R] to which objection is made."); *United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam) (explaining that plain error review is appropriate in absence of objection). "Parties filing objections to a magistrate's [R&R] must specifically identify those findings objected to. Frivolous, conclusive, or general objections need not be considered by the district court." *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988). After conducting the required review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## III. Discussion

### A. Factual Objection

The Court first addresses Plaintiff's objection to one of the Magistrate Judge's factual determinations. In its statement of material fact, Defendant proposed the following fact: "The GADOE mandates that evaluators conduct at least two formal observations and four walkthroughs, or frequent brief observations, of teachers with feedback

18

provided to the evaluated teacher with teachers responsible for submitting documentation, including lesson plans, as requested by the evaluator." (Dkt. 58-2 ¶ 9.)  In response, Plaintiff denied the statement and contended that, absent the discriminatory acts alleged in this lawsuit, Plaintiff would have been on the "flex" evaluation plan—which includes only one walkthrough, one observation, and a summative evaluation—because of her years of service as a teacher. (Dkt. 61-1 ¶ 9.) The Magistrate Judge overruled Plaintiff's denial. (Dkt. 84 at 6 n.6.) The Magistrate Judge determined that because Plaintiff had been employed by Defendant for less than three years, she would not be eligible for the "flex" evaluation plan since it only applied to teachers with three or more years of experience. (*Id.*)  Plaintiff objects to this finding and asserts that the three-year mark is measured by *total* teaching experience, not teaching experience at one school. (Dkt. 86 at 2.)

The Court conducts a de novo review and sustains Plaintiff's objection.   The GADOE TKES Implementation Handbook says all teachers who received a proficient or exemplary rating on the previous year's annual evaluation and have more than three years' experience are subject to the "flex" evaluation plan. (Dkt. 61-7 at 12.)  Before being

employed by Defendant, Plaintiff taught at Atlanta Public Schools for almost a year and at Marietta City Schools for a year and a half. (Dkt. 77 at 10:12–11:6.) She then taught at the School for two years before the year at issue (i.e., the 2017–18 school year). She thus had more than three years' experience. She also received a proficient rating (i.e., a score of 25 and a Level III rating) for her Summative Assessment during the 2016–17 school year.

**B.   FMLA Claims (Counts I and II)**

Plaintiff alleges Defendant interfered with the exercise of her FMLA rights (Count I) and retaliated against her for taking leave (Count II). (Dkt. 84 at 32.) Congress enacted the FMLA in part to address problems arising from "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4). The FMLA has two types of claims: "(1) interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, *see* 29 U.S.C. § 2615(a)(1), and (2) retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act, *see* 29 U.S.C. § 2615(a)(1) &

20

(2)." *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001). Plaintiff asserts both.

### 1.    FMLA Interference (Count I)

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). To state an inference claim, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland*, 239 F.3d at 1206–07 (citing *O'Connor v. PCA Fam. Health Plan, Inc.*, 200 F.3d 1349, 1353–54 (11th Cir. 2000)). "[W]here an employee's need for FMLA leave is unforeseeable, the employee need only provide her employer with notice sufficient to make the employer aware that her absence is due to a potentially FMLA-qualifying reason." *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1436 (11th Cir. 1997). Once an employee informs her employer that potentially FMLA-qualifying leave is needed, the regulations place the burden on the employer to ascertain whether the employee's absence qualifies for FMLA protection. *See Cruz v. Publix Super Mkts., Inc.*, 428 F.3d 1379, 1383 (11th Cir. 2005); 29 C.F.R.

§ 825.303(b) ("The employer will be expected to obtain any additional required information through informal means.").

Defendant argues Plaintiff's interference claim fails because it granted her all the FMLA leave she requested and, therefore, did not deny her any benefits to which she was entitled. (Dkt. 84 at 23.) Plaintiff contends Defendant interfered with her FMLA rights by (1) denying her FMLA leave for the days in August and September during which she was seeking a medical diagnosis, (2) using those days against her in evaluations and nonrenewal, and (3) reprimanding her for taking intermittent FMLA protected breaks. (*Id.* at 35.)

Viewing the facts in the light most favorable to Plaintiff, the Magistrate Judge found that Plaintiff suffered an unforeseeable medical condition and provided enough information to Ms. Mitchell and Ms. Young to put Defendant on notice that her absences from August 24–29, 2017 and September 1, 5, and 15, 2017 may qualify for protection under the FMLA. (*Id.* at 36.) The Magistrate Judge found that Plaintiff's August 31, 2017 email triggered Defendant's duties under the FMLA, and the burden shifted to Defendant to obtain more information to determine whether those absences qualified for FMLA protection. (*Id.* at

37.)  Rather than gather additional information, Defendant (through Ms. Young) chastised Plaintiff for excessive absenteeism in an email dated September 5, 2017, and Defendant repeatedly rejected Plaintiff's attempts to apply for FMLA protection for those early absences.  (*Id.*) According to Plaintiff, Defendant told her it would not consider those absences for FMLA protection and instructed her to remove them from her request (along with requests for additional accommodations) in order for her intermittent FMLA leave request to be granted.  (*Id.*)  Based on this, the Magistrate Judge found, at this stage of the litigation, that Defendant failed to comply with its duties under the FMLA by (1) ignoring Plaintiff's initial multi-day absences after notice that they were due to a serious health condition, (2) failing to investigate the matter, and (3) denying Plaintiff's attempts to request that those days be included in her FMLA-protected leave.  (*Id.* at 38.)  The Magistrate Judge thus recommended the Court deny Defendant's motion as to this claim. The Court finds no plain error in this recommendation.  Viewing the facts in the light most favorable to Plaintiff, she has submitted enough evidence to survive summary judgment.

## 2.    FMLA Retaliation (Count II)

Under the FMLA, it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]."  29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c).  In the absence of direct evidence of discrimination, courts apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000).  To establish a prima facie case of retaliation under the FMLA, a plaintiff must show that (1) the employee engaged in statutorily protected conduct, (2) she suffered an adverse employment action, and (3) there is a causal connection between the two.  *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010).  If a plaintiff establishes a prima facie case of retaliation, then the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action.  *Bartels v. S. Motors of Savannah, Inc.*, 681 F. App'x 834, 838 (11th Cir. 2017) (per curiam).  If the defendant meets that burden, the plaintiff then bears the burden of showing that the proffered reason is pretext for the retaliation.  *Id.*  But "[i]f a plaintiff's FMLA retaliation claims fails under [the

24

*McDonnell Douglas*] framework, [s]he may nonetheless overcome summary judgment by providing 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Dobson v. Fulton Cnty.*, No. 1:19-cv-00902-ELR-RVG, 2020 WL 5549246, at *11 n.15 (N.D. Ga. July 9, 2020) (quoting *Marx v. Baker Cnty. Med. Servs., Inc.*, No. 3:16-cv-462-J-32MCR, 2018 WL 4215950, at *7 (M.D. Fla. Sept. 5, 2018)).

### a)     Plaintiff's FMLA Requests and Leave

Defendant concedes that the first two elements of a prima facie case of retaliation are met.[9]  (Dkt. 84 at 44.)  The third element—whether there is a causal connection between Plaintiff's protected activity and her termination—is at issue.  "The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were not

---

[9] Plaintiff's initial FMLA leave request from September 18, 2017 through October 30, 2017 and Plaintiff's request for intermittent FMLA leave from October 31, 2017 through September 19, 2018 are protected activities under the Act.  *See Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017) (taking FMLA leave is a protected activity); *Pereda v. Brookdale Senior Living Cmtys., Inc.*, 666 F.3d 1269, 1276 (11th Cir. 2012) (request for post-eligible FMLA leave is protected activity).  Plaintiff suffered an adverse employment action on May 11, 2018, when Defendant chose not to renew her contract, thereby terminating her.

wholly unrelated." *Krutzig*, 602 F.3d at 1234 (internal quotation marks omitted) (citing *Brungart*, 231 F.3d at 799). "Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decisionmaker was aware of the protected conduct at the time of the adverse employment action." *Id.* (citing *Brungart*, 231 F.3d at 799). The Magistrate Judge found the element is met. (Dkt. 84 at 46–48.) In an evaluation on November 30, 2017 (the same day Plaintiff requested intermittent FMLA leave), Ms. Young cautioned Plaintiff about attendance. (*Id.* at 46.) In January or February of 2018, Defendant began its contracting process for the next school year, and Ms. Young advised HR that Plaintiff was performing poorly. (*Id.* at 47.) Ms. Young continued to rate and observe Plaintiff through the rest of the 2017–18 school year. (*Id.*) In the Summative Assessment, for example, Ms. Young assigned Plaintiff a Level II rating on professionalism (the standard related to absenteeism). (*Id.*) Ms. Young made the decision not to renew Plaintiff's contract because of, among other things, the ratings she assigned Plaintiff throughout the school year. (*Id.*) Viewing the facts in the light most favorable to Plaintiff, the Magistrate Judge concluded that a reasonable factfinder could conclude that Plaintiff's request for and use

26

of FMLA leave was not wholly unrelated to Ms. Young's determination that she was not a candidate for renewal. (*Id.* at 47–48.) The Court finds no plain error in this conclusion.

Because Plaintiff established a prima facie case of FMLA retaliation, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for her termination. The Magistrate Judge found Defendant met this burden by citing Plaintiff's consistent performance issues, which led to her nonrenewal. (*Id.* at 48.) Plaintiff objects to this finding. (Dkt. 86 at 7.) Plaintiff argues that the superintendent, not Ms. Young, was the decisionmaker, and there is no evidence about the factors which the superintendent actually considered.[10] (*Id.* at 8–9.) Defendant, in its interrogatory responses, contends the decision to not renew Plaintiff's contract was made by Ms. Young. (Dkt. 61-4 at 4, 6, 10.) But Ms. Young repeatedly testified in her deposition that she provides the names of teachers who may not be eligible for renewal based on certain criteria but does *not* handle nonrenewal. (Dkt. 80 at 38:9–39:21, 41:11–12 ("Again, the district does

---

[10] The Magistrate Judge did not address this argument. Instead, the Magistrate Judge repeatedly emphasizes that Ms. Young is the "undisputed" decisionmaker. (*See* Dkt. 84 at 42 n.40, 60, 61 n.51.)

the nonrenewal."), 43:7–10 ("So again, at the end of the evaluation process, when a teacher is not proficient — they're not at a Level 3, then the district will make that recommendation for nonrenewal.").)   She testified that "human resources and the school district" handle nonrenewal.  (*Id.* at 38:12–13.)

The Eleventh Circuit has expressly held that "there must be 'evidence that [the] asserted reasons for discharge were actually relied on' or 'the reasons are not sufficient to meet defendant's rebuttal burden.'"  *Increase Minority Participation by Affirmative Change Today of Nw. Fla., Inc. v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990) (citing *Lee v. Russell Cnty. Bd. of Educ.*, 684 F.2d 769, 775 (11th Cir. 1982)). Without knowing who made the decision, it is impossible to know whether that person actually relied on the asserted reasons.  Viewing the facts in the light most favorable to Plaintiff, there is a genuine dispute of material fact as to who made the decision to not renew Plaintiff's contract.   That prevents the Court from concluding Defendant has satisfied its rebuttal burden under *McDonnell Douglas*.  Having reached this conclusion, the Court need not discuss the third step of *McDonnell Douglas*.   That said, this conclusion does not impact the Magistrate

28

Judge's overall conclusion that Defendant's motion for summary judgment be denied as to Plaintiff's FMLA retaliation claim regarding her requests for and use of protected leave.

### b) Opposition Clause

Because Plaintiff engaged in protected activity by filing multiple grievances with Defendant opposing Ms. Young's actions, the Magistrate Judge also addressed Plaintiff's FMLA retaliation claim under the FMLA's opposition clause.  (Dkt. 84 at 52.)  Plaintiff engaged in a protected activity when she filed an employee discrimination complaint form on February 2, 2018.  She suffered adverse actions—i.e., being identified as a candidate for nonrenewal and termination.  The Magistrate Judge found a causal connection exists between her protected activity and adverse actions because of temporal proximity.  (*Id.* at 54.)  Again, the Magistrate Judge found Defendant proffered a legitimate, non-retaliatory reason for withholding Plaintiff's contract and terminating her.  (*Id.*)  But having found there is a genuine dispute of material fact as to who decided to not renew Plaintiff's contract, the Court is unable to determine whether the second element of *McDonnell Douglas* is met.  This conclusion, however, does not impact the Magistrate Judge's

recommendation that Defendant's motion be denied as to Plaintiff's FMLA opposition claim.

## C.     ADA and Rehabilitation Claims (Counts III and IV)[11]

### 1.     Disability Discrimination (Count III)

Plaintiff alleges Defendant discriminated against her and failed to accommodate her by reprimanding her for necessary breaks, using covered absences as a reason to give her low evaluation scores, and declining to renew her contract.  (Dkt. 84 at 55.)  Defendant argues her disability discrimination claim fails because she has identified no qualifying disability, Defendant granted all Plaintiff's requested FMLA

---

[11] "The Rehabilitation Act prohibits federal agencies [and recipients of federal money] from discriminating in employment against individuals with disabilities."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000)); *see also* 29 U.S.C. § 794(a); 42 U.S.C. § 1981a(a)(2).  "The standard for determining liability under the Rehabilitation Act is the same as that under the [ADA]; thus, cases involving the ADA are precedent for those involving the Rehabilitation Act."  *Ellis*, 432 F.3d at 1326.  The Magistrate Judge, therefore, stated that Plaintiff's claims under the Rehabilitation Act are treated the same, and effectively merged with, her ADA claims.  (Dkt. 84 at 56 n.47.)

leave, and she failed to identify a non-disabled comparator with identical performance issues who was treated preferentially.  (*Id.* at 55–56.)[12]

The ADA prohibits a covered employer from discriminating against a qualified individual based on a disability.   42 U.S.C. § 12112(a). Employees may claim discrimination under the ADA in one of two ways: disparate impact or disparate treatment.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52–53 (2003).   Disparate impact means the employer's facially neutral conduct had a disparate impact on members of a protected class.  *Id.*  Disparate treatment means the employer treated certain employees worse than others because they possessed a protected trait.  *Id.*   The Magistrate Judge interpreted Count III to allege a disparate treatment claim.   (Dkt. 84 at 55 n.44.)   "Liability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated the employer's decision.'" *Raytheon Co.*, 540 U.S. at 52 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

---

[12] Defendant also contends Plaintiff experienced no adverse actions because she was not admonished for taking breaks, Ms. Young rescinded the letter of direction, and her protected absences were not held against her in evaluations. (Dkt. 84 at 56.)  The Magistrate Judge concluded that Defendant's assertion lacks merit because Plaintiff was terminated, which is an "obvious adverse action."  (*Id.* at 59.)

Where direct evidence is not present, discrimination may be shown by using the burden-shifting framework from *McDonnell Douglas* or by "presenting circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012) (alteration adopted) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).

The Magistrate Judge concluded that Defendant's assertion that Plaintiff is not a disabled individual as defined by the ADA lacks merit. (Dkt. 84 at 58.)  The Court sees no plain error in this finding.  The ADA states that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A).  Plaintiff suffers from anxiety, panic disorder, and attention deficit hyperactivity disorder, which cause severe chest pain, problems breathing, and blurry vision.  (Dkt. 84 at 59.)  She

takes three medications to deal with her conditions and is under the care of a physician. (*Id.*) When she experiences an episode, her symptoms substantially limit the major life activities of working, breathing, concentrating, communicating, and seeing—among others. (*Id.*)

The Magistrate Judge concluded that Plaintiff presented circumstantial evidence that creates a triable issue concerning Defendant's discriminatory intent.[13] (*Id.* at 60.) The Court sees no plain error in this conclusion. Ms. Young gave Plaintiff low scores on her evaluations, placed her on a remediation plan, and gave her name to Defendant as a possible candidate for nonrenewal. Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that Ms. Young intentionally discriminated against Plaintiff based on her reactions to Plaintiff's disability-related absences and need for accommodations. The Magistrate Judge thus recommended Defendant's motion be denied as to Plaintiff's disability discrimination claims under

---

[13] Because of this, the Magistrate Judge said it did not matter that Plaintiff did not identify a non-disabled comparator with identical performance issues. (Dkt. 84 at 59.) The Court agrees. *See Hamilton*, 680 F.3d at 1320 (explaining that a plaintiff "does not have to show a comparator if she can show enough non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination").

the ADA and Rehabilitation Act.  The Court finds no plain error in this recommendation.

## 2.    Retaliation (Count IV)

Plaintiff alleges Defendant retaliated against her for engaging in protected activity (i.e., complaining about discrimination internally and filing an EEOC charge).  (Dkt. 84 at 61.)  The Magistrate Judge recommended Defendant's motion be denied as to Plaintiff's retaliation claims under the ADA and Rehabilitation Act for the same reasons set forth regarding the FMLA retaliation claim.  (*Id.* at 63.)  The Court finds no plain error in treating Plaintiff's retaliation claims under the ADA and Rehabilitation Act the same as Plaintiff's retaliation claim under the FMLA.  *Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018) (addressing FMLA and ADA retaliation claims together because they "require similar legal analysis and depend upon the same set of facts"); *Jerome v. Barcelo Crestline, Inc.*, No. 1:07-CV-0447-WSD-LTW, 2009 WL 10657330, at *3 n.2 (N.D. Ga. Nov. 10, 2009) ("[T]he framework for adjudicating retaliation claims under Title VII, the ADA, and the FMLA are basically the same."), *adopted by* 2009 WL 10657684 (N.D. Ga. Nov. 30, 2009).  But having found there is a genuine dispute of material fact

as to who decided to not renew Plaintiff's contract, the Court is unable to determine whether the second element of *McDonnell Douglas* is met. This conclusion, however, does not impact the Magistrate Judge's ultimate recommendation that Defendant's motion be denied as to Plaintiff's retaliation claims under the ADA and Rehabilitation Act.

### D.   Title VII and Related § 1981 Claims (Count V)

Plaintiff alleges Defendant retaliated against her for complaining of, and objecting to, racial discrimination and requesting staff ethnicity training.  (Dkt. 84 at 63.)  "Both Title VII and § 1981 prohibit employers from retaliating against a person because she has opposed any practice prohibited by Title VII or made a charge of discrimination."[14]  *Wells v. Gen. Dynamics Info. Tech. Inc.*, 571 F. App'x 732, 736 (11th Cir. 2014) (per curiam) (citing 42 U.S.C. § 2000e–3(a)).   Employment-related

---

[14] Title VII prohibits employers from discriminating against prospective or current employees based on race.  42 U.S.C. § 2000e–2(a)(1).  It also prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII]."  *Id.* § 2000e–3(a).  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," *id.* § 1981(a), and prohibits an employer from taking an adverse action against an employee who has opposed the impairment of their contractual relationship on discriminatory grounds, *Locascio v. BBDO Atlanta, Inc.*, 56 F. Supp. 3d 1356, 1363 (N.D. Ga. 2014).

retaliation claims brought under § 1981 are analyzed using the same framework as Title VII retaliation claims. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008). The *McDonnell Douglas* framework applies to retaliation claims under both statutes. *See Worley v. City of Lilburn*, 408 F. App'x 248, 251 (11th Cir. 2011) (per curiam) (applying *McDonnell Douglas* to Title VII and 1981 retaliation claims). To establish a prima facie case of retaliation under Title VII or § 1981, a plaintiff must show (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there is a causal connection between the two. *Goldsmith*, 513 F.3d at 1277 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

On the first element, a plaintiff must have a "good faith, reasonable belief" that the defendant has engaged in unlawful employment practices. *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *Little v. United Techs.*, 103 F.3d 956, 960 (11th Cir. 1997). Under this standard,

> a plaintiff's burden . . . has both a subjective and an objective component. A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in the light of the facts and record presented.

*Little*, 103 F.3d at 960.   The Magistrate Judge found Plaintiff's complaints about the treatment of students, her requests for ethnicity training, and her February 2, 2018 formal complaint (reiterating her allegations of teacher-on-student discrimination based on race) do not constitute protected conduct under Title VII and § 1981.  (Dkt. 84 at 66–67.)  According to the Magistrate Judge, "those complaints do not support an objective belief that [D]efendant engaged in an unlawful *employment* practice or interfered with [P]laintiff's teaching contract on the basis of race.  Nor did [D]efendant require [P]laintiff to discipline those students or force her to engage in discriminatory behavior as part of her contractual duties."  (*Id.* at 67 (emphasis in original).)

In reaching that decision, the Magistrate Judge distinguished *Phillips v. Hood River School District*, No. CV 98-1161-AS, 1999 WL 562682 (D. Ore. June 1, 1999).  In that case, the plaintiff claimed she was terminated in retaliation for reporting a sexually hostile work environment.  *Id.* at *3–4.  The plaintiff alleged that a group of three boys were routinely sexually harassing a female student during class, that she reported the conduct to the principal and assistant superintendent, that the two administrators took no action, and that she was discharged as a

result of her complaints on behalf of the female student. *Id.* at \*4. The district court found that the plaintiff had a reasonable belief that the defendant was engaged in an unlawful employment practice—i.e., failing to remedy a sexually hostile work environment. *Id.* at \*4–5. The Magistrate Judge distinguished this case by emphasizing that three incidents in which African American students were unfairly disciplined by Caucasian teachers and an incident in which a teacher made a racially inappropriate comment in class do not create a "serious and pervasive racially hostile work environment." (Dkt. 84 at 68.) The Magistrate Judge concluded that Plaintiff did not have an objectively reasonable belief that Defendant refused to remedy a severe and pervasive racially hostile work environment, unlike the plaintiff in *Phillips*. (*Id.*) Ultimately, the Magistrate Judge recommended Defendant's motion be granted as to Plaintiff's Title VII and § 1981 retaliation claims. (*Id.* at 69.)

Plaintiff objects, contending "it was objectively reasonable for her to believe that permitting teachers to treat African-American students worse than Caucasian students and denying her request for ethnicity training for staff was racially discriminatory." (Dkt. 86 at 5.) Defendant

says this objection is unfounded because Plaintiff never complained about a severely racially hostile work environment.  (Dkt. 89 at 2–4.) Defendant argues that Plaintiff's complaints about "the treatment of African-American *students* by teachers is not in opposition to an unlawful *employment* practice by Defendant and therefore not a statutorily protected activity."  (*Id.* at 3 (emphasis in original).)

After conducting a de novo review, the Court agrees with Defendant and the Magistrate Judge.  While it is true a plaintiff who allegedly engaged in protected conduct under the opposition clause need not prove that the underlying discriminatory conduct that she opposed was actually unlawful, she must show that she had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. *See Knott v. DeKalb Cnty. Sch. Sys.*, 624 F. App'x 996, 997 (11th Cir. 2015) (per curiam) (citing *Little*, 103 F.3d at 960).  Plaintiff did not have a good faith, reasonable belief that Defendant was engaged in an unlawful employment practice.  No reasonable jury could find Plaintiff's belief that her complaints about the treatment of African American students, her requests for staff ethnicity training, and her February 2, 2018 formal complaint constituted opposition to an unlawful employment

practice to be objectively reasonable.  Plaintiff has not set forth facts sufficient to support an objective belief that Defendant was engaged in unlawful employment practices.  And, unlike in *Phillips*, there is no evidence that Defendant refused to remedy a severe and pervasive racially hostile work environment.  To the contrary, Defendant disciplined the teacher who used racially inappropriate language.  For these reasons, the Court overrules Plaintiff's objection on this count and adopts the R&R.

### E.    Title VI and Related § 1981 Claims (Count VI)

Plaintiff alleges Defendant retaliated against her for complaining about racial discrimination on behalf of African American students. (Dkt. 84 at 69.)  Title VI prohibits discrimination based on race in programs receiving federal financial assistance.  42 U.S.C. § 2000d.  Title VI's prohibition on racial discrimination includes a prohibition on retaliation for complaining of racial discrimination.  *Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x 906, 911 n.8 (11th Cir. 2013) (per curiam) (recognizing Title VI retaliation claim).  Section 1981 encompasses claims of retaliation.  *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008).  In the absence of direct evidence of retaliation, the

*McDonnell Douglas* framework applies.   *Chaney v. Taylor Cnty. Sch. Dist.*, No. 4:11-CV-142, 2014 WL 28815, at *1–2 (M.D. Ga. Jan. 2, 2014). Again, to establish a prima facie case of retaliation, a plaintiff must show (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there is a causal connection between the two. *Id.* at *2; *see also McCullough v. Bd. of Regents of Univ. Sys. of Ga.*, No. 1:13-CV-118, 2014 WL 4924497, at *2 (M.D. Ga. Sept. 30, 2014) (applying these three elements to a Title VI retaliation claim).

The Magistrate Judge assumed—without deciding—that Plaintiff's complaints about the treatment of African American students were protected conduct under Title VI. (Dkt. 84 at 71.) The Magistrate Judge found Plaintiff cannot establish a causal connection because the temporal proximity was insufficient. (*Id.*) Plaintiff's last complaint about the treatment of African American students occurred on August 3, 2017. (*Id.*) The Magistrate Judge explained that "approximately five months elapsed between [P]laintiff's race-related complaint to Ms. Young and [D]efendant's first materially adverse employment action against her— its January or February 2018 decision to hold [P]laintiff's contract renewal" and reasoned that "[t]he case law is clear that, without more,

such a lapse in time simply is insufficient to establish a causal connection." (*Id.*)  The Magistrate Judge added that, unlike Plaintiff's FMLA and ADA retaliation claims where her supervisors repeatedly raised her absences and breaks in their interactions with and evaluations of her, there are no facts showing her supervisors made any additional references or took any additional actions related to her racism-related complaints after August 3, 2017 until she tried to formally complain to Defendant in late December 2017.  (*Id.* at 72.)

Plaintiff objects to the Magistrate Judge's finding.  (Dkt. 86 at 6.) She argues that holding her contract was not the first adverse action because Ms. Young began treating Plaintiff differently at the beginning of the 2017–18 school year by using Plaintiff's absences and breaks against her in interactions with and evaluations of her.[15]  (*Id.*)  The Supreme Court has defined an adverse employment action in the context of a retaliation claim as an action by an employer that is harmful to the

_____

[15] Defendant says Plaintiff's objection is unfounded because Plaintiff's absences have no correlation to her racial discrimination claims.  (Dkt. 89 at 5.)  The Court rejects Defendant's argument because at this stage of the litigation the Court views all facts in the light most favorable to Plaintiff, and a reasonable jury could conclude Defendant's treatment and evaluations of Plaintiff was due, at least in part, to Plaintiff's complaints about the treatment of African American students.

point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington*, 548 U.S. at 57; *see also Wallace v. Ga. Dep't of Transp.*, 212 F. App'x 799, 802 (11th Cir. 2006) (per curiam). Markedly worse performance evaluations that significantly impact an employee's wages, professional advancement, or employment status are materially adverse employment actions.[16] *See James v. Metro. Gov't of Nashville*, 243 F. App'x 74, 79 (6th Cir. 2007); *Cooper v. City of Phila.*, No. 06-576, 2007 WL 1825399, at *2 (E.D. Pa. June 21, 2007) (performance evaluation was materially adverse in Title VII retaliation context where the plaintiff received "unacceptable" ratings in several categories and overall rating of "improvement needed" and evaluation "was significantly poorer" than her previous two

---

[16] To be clear, "[n]egative performance evaluations, standing alone, do not constitute adverse employment action sufficient to satisfy the second element of a prima facie case of retaliation." *Worley*, 2009 WL 10668430, at *13 (quoting *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001)). But "a poor performance evaluation that directly results in denial of pay raise of any significance constitutes an adverse employment action." *Id.* (quoting *Braswell v. Allen*, 586 F. Supp. 2d 1297, 1307 (M.D. Ala. 2008)). Indeed, "a lower score on an employment evaluation, by itself, is not actionable under Title VII unless the plaintiff can establish that the lower score led to a more tangible form of adverse action, such as ineligibility for promotional opportunities." *Id.* (quoting *Brown v. Snow*, 440 F.3d 1259, 1265–66 (11th Cir. 2006)).

performance evaluations in which she was rated overall as "superior"). During the 2017–18 school year, Plaintiff received multiple informal and formal performance evaluations.  (Dkt. 84 at 19.)  For example, Plaintiff received five Level II ratings on November 30, 2017 and four Level II ratings on December 20, 2017.  (*Id.* at 19–20.)  On her mid-year or "formative" evaluation for the 2017–18 school year, Plaintiff was rated at a Level II and assigned a score of 15.  (*Id.* at 20.)  Those evaluations (among others) are markedly worse than her Summative Assessment at the end of the 2016–17 school year where she received a Level III rating. (*Id.* at 19.)  Those evaluations significantly impacted Plaintiff's employment status.  Defendant put her on a remediation plan and then used her low evaluation scores and the fact she was on a remediation plan to hold her contract.[17]  (*Id.* at 21, 27–29.)  This is sufficient to show that a reasonable employee would be dissuaded from making or

_____

[17] When Defendant begins the contract renewal process each January or February, Defendant asks the principals for the names of teachers who have scored less than a 17 on their current formative assessments or the names of teachers who are working on remediation plan.  (Dkt. 84 at 27.) According to Ms. Young, a teacher who receives a Level I or II rating may not be offered a contract.  (*Id.* at 28.)  When it was time for the contract renewal process in the 2017–18 school year, Ms. Young notified HR that Plaintiff was being assessed at a Level II and was on a remediation plan. (*Id.* at 27.)

supporting a charge of discrimination on the basis of receiving lower evaluation scores that led to the tangible harms of being placed on a remediation plan and not receiving a renewed contract. This is not a case, for example, where the lower evaluation scores had no impact beyond bruising the plaintiff's ego or hurting the plaintiff's feelings. *See Hilt v. Nicholson*, No. 3:05-0371, 2007 WL 1577701, at *7 (M.D. Tenn. May 31, 2007) (even though the plaintiff disputed the basis for the lowered performance evaluation score, he failed to show that the scores had any effect on him beyond a bruised ego); *Blackledge v. Ala. Dep't of Mental Health & Mental Retardation*, No. 2:06cv321-ID, 2007 WL 3124452, at *28 (M.D. Ala. Oct. 25, 2007) (reduced performance score not an adverse employment action where score still satisfied job expectations and did not cause any harm beyond hurt feelings).

While Plaintiff is correct that there are earlier adverse actions, the causal connection element is still not satisfied. A plaintiff can establish a causal connection if she can prove a close temporal proximity between the protected activity and the adverse employment action. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam). "This standard requires that the actions be 'very close.'" *Raspanti v. Four*

45

*Amigos Travel, Inc.*, 266 F. App'x 820, 823 (11th Cir. 2008) (per curiam) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). Indeed, "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Thomas*, 506 F.3d at 1364; *see also Raspanti*, 266 F. App'x at 823 ("A delay of 'three to four months' does not suffice." (alteration adopted)). Here, Plaintiff's last complaint about the treatment of African American students occurred on August 3, 2017. Assuming—without deciding—that the August 3rd complaint is protected conduct under Title VI, Plaintiff cannot establish a causal connection between that conduct and the evaluations. At minimum, approximately four months elapsed between the August 3rd complaint and Defendant's first adverse employment action against her—its November 30th evaluation. Accordingly, the Court overrules Plaintiff's objection and adopts the Magistrate Judge's recommendation that Defendant's motion be granted as to the claims in Count VI.

## IV. Conclusion

The Court **SUSTAINS IN PART** and **OVERRULES IN PART** Plaintiff's Objections (Dkt. 86) and **ADOPTS IN PART** and **REJECTS**

**IN PART** the Magistrate Judge's Report and Recommendation (Dkt. 84). The Court's decision to reject the Magistrate Judge's finding as to two of the facts and the second element of *McDonnell Douglas* for the retaliation claims does not impact the Court's decision otherwise to adopt the recommendation that it grant in part and deny in part Defendant's motion.   Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment (Dkt. 58).   Summary judgment is granted as to Counts V and VI.

The Court **ORDERS** this case to mediation.   The parties may retain the mediator to mediate this case.   The expense of a retained mediator must be paid by the parties.   The parties, alternately, may request that the Court appoint a magistrate judge to conduct the mediation.   The parties are not required to pay for mediation by a magistrate judge.

The parties shall advise the Court, on or before September 1, 2021, of their mediation preference.   If they elect to retain their own mediator, the parties shall identify the mediator on or before September 15, 2021. The parties must have present at the mediation a person with authority to settle this litigation.

The parties shall, within five days after the mediation, notify the Court in writing whether mediation led to a settlement of this action.

The Court **STAYS** this case pending mediation.   The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case during the period of stay.

**SO ORDERED** this 18th day of August, 2021.


_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE